[No. B075740. Second Dist., Div. Seven. Apr. 28, 1994.]

CONCERNED CITIZENS OF SOUTH CENTRAL LOS ANGELES et al., Plaintiffs and Appellants, v.
LOS ANGELES UNIFIED SCHOOL DISTRICT et al., Defendants and Respondents.

## COUNSEL

Mary M. Lee, Paul E. Lee and Richard A. Rothschild for Plaintiffs and Appellants.

O'Melveny & Myers, James W. Colbert III and Edward J. Szczepkowski for Defendants and Respondents.

## OPINION

LILLIE, P. J.—Plaintiffs Concerned Citizens of South Central Los Angeles and Equal Rights Congress of Los Angeles, unincorporated associations, and Gwendolyn Cannon appeal from an order denying their petition for writ of mandate.[1]

In their petition, plaintiffs sought to compel defendants Los Angeles Unified School District (District) and Board of Education of the City of Los

---

[1]The order appealed from involves the first two causes of action of a pleading containing six causes of action. The first two causes of action each constitute a petition for writ of mandate under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.); the third cause of action is a petition for writ of mandate pursuant to the planning and zoning laws; the fourth cause of action is for a writ of mandate for violation of the Real Property Acquisition and Relocation Assistance Act of 1970; the fifth cause of action is for injunctive relief and the sixth cause of action is for declaratory relief.

The order is appealable as a final judgment in a special proceeding. (Code Civ. Proc., §§ 1064 and 904.1, subd. (a)(1); *Knoll v. Davidson* (1974) 12 Cal.3d 335, 343 [116 Cal.Rptr. 97, 525 P.2d 1273]) The general appeal provisions of the Code of Civil Procedure govern all special proceedings, even those intended to be summary in nature, unless the Legislature has

Angeles (Board) to set aside the certification of the subsequent environmental impact report (SEIR) for the planned construction of an elementary school, "Jefferson 3," at a site in a low-income minority neighborhood in South Central Los Angeles, and requiring the elimination of 67 units of affordable housing and the displacement of 280 people; plaintiffs also challenged the Board's approval of the Jefferson 3 project.

### FACTUAL AND PROCEDURAL BACKGROUND

As most of the factual and procedural background of this case was admitted in respondents' answer to the first amended petition for writ of mandate, we obtain the following facts from those admitted portions, as well as from the administrative record.

The community of South Central Los Angeles is a primarily minority, low-income community of about 200,000 residents, located about 1.5 miles south of downtown Los Angeles. The focus of this action is the proposed site for the "Jefferson 3" elementary school, lying within the Jefferson High School complex attendance area (Jefferson attendance area).

In 1986, defendant Board, the governing and policymaking entity for the District, determined that the existing overcrowded conditions and projected enrollment within the Jefferson attendance area necessitated construction of

---

specifically prohibited appeal in the statute creating the particular special proceeding. (*Knoll v. Davidson, supra,* 12 Cal.3d at p. 343.) "[U]nless the statute creating the special proceeding prohibits an appeal, there is an appeal from a final judgment entered in a special proceeding." (*Ibid.*) Moreover, despite the fact that there remain pending in the trial court additional claims that have not been resolved, the order denying a petition for writ of mandate under CEQA is treated as an appealable final judgment. (See *Elmore* v. *Imperial Irrigation Dist.* (1984) 159 Cal.App.3d 185, 190-191 [205 Cal.Rptr. 433]; *Bullock* v. *City and County of San Francisco* (1990) 221 Cal.App.3d 1072, 1086 [271 Cal.Rptr. 44].)

Appellants cite language in *Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1312-1313, footnote 1 [8 Cal.Rptr.2d 473], which suggested that although the order involved therein was not a final judgment due to the pendency of other claims in the trial court, the appellate court, under an exception to the one final judgment rule, had discretion to entertain the appeal of an order granting or denying a petition for writ of mandate. We disagree with any suggestion in *Sierra Club* that the appellate court has discretion to consider an appeal from a nonappealable order. An appellate court has no power to make appealable an order that is not appealable. (*Velicescu* v. *Pauna* (1991) 231 Cal.App.3d 1521, 1523 [282 Cal.Rptr. 832].)

In any event, the instant order is indeed appealable as a final judgment in a special proceeding under CEQA, which proceeding could have been filed separately from the remaining claims. The fact that the special proceeding was joined with other special proceedings or with a civil action does not destroy its character as a special proceeding. As a special proceeding, it is subject to certain rules of procedure which do not govern the other causes of action. (See, e.g., Pub. Resources Code, § 21167 et seq.) Thus, the combining of mandamus claims under CEQA with other types of claims does not destroy the appealability of the instant order.

four new elementary schools, the expansion of an existing elementary school, and construction of a new junior high school and a new senior high school. One of the four proposed new elementary schools is the Jefferson 3 school.

In November and December 1987, the Board conducted public meetings to solicit community input regarding potential sites for the proposed Jefferson attendance area school construction program. Community residents, including plaintiffs, participated in the meetings; plaintiffs, although favoring additional school construction, opposed the construction or expansion of additional school facilities on sites requiring residential displacement and destruction of existing housing. In March 1988, the Board approved the intensive study of eight sites for school construction and ordered the preparation of a draft environmental impact report (EIR) for each site. The Board proposed that the Jefferson 3 school be located on a 4.6-acre rectangular site, bounded by Broadway, Main Street, 47th Street and 47th Place, and which contained 67 dwelling units, 3 businesses and 28 swap meet vendors.

In November 1988, the Board certified a final EIR for the proposed Jefferson 3 project. In December 1988, plaintiffs filed this proceeding challenging the approval of the Jefferson 3 project. On August 3, 1989, a stipulation and order was entered wherein defendants District and Board agreed to prepare an SEIR for the Jefferson 3 project. In February 1992, the SEIR was completed, and, on June 25, 1992, over the continuing objection of plaintiffs, the Board certified the SEIR and once again approved the Jefferson 3 project. The SEIR described the proposed school as a two-story structure with thirty classrooms, administrative offices, library, and subsidiary facilities.

In connection with its approval of the project, the Board adopted a statement of facts and findings and a statement of overriding considerations. The Board found that the project would cause "a significant loss of affordable housing in the local area. This also includes a significant cumulative loss of affordable housing in South Central Los Angeles, as caused by this and other projects in the region." The Board also found that "specific economic, social, and other considerations make further reduction of these impacts or adoption of alternatives avoiding these impacts infeasible." The Board's statement of overriding considerations stated that "The proposed project is in response to the need for educational facilities in an area of the School District that is experiencing overcrowded school facilities and high enrollment. This need is documented in the Administrative Record. The LAUSD finds that a new elementary school is needed to avoid overcrowding

at other elementary schools in the area and provide a healthy atmosphere of public education. [¶] . . . There are already approximately 3,350 students being transported out of the Jefferson attendance area to other attendance areas of LAUSD where space is available. The new school would reduce the number of students requiring bus transportation due to overcrowded conditions in the schools nearest their homes."

The Board also concluded that "to the extent that any impacts attributable to the project remain unmitigated, such impacts are acceptable in light of the overriding social, economic and other benefits set forth here, in the EIR and in the Administrative Record. The LAUSD Board finds that the alternatives set forth in the EIR are infeasible and less desirable than the project itself. The LAUSD Board finds that the project's benefits outweigh the unmitigated impacts and justify approval of the project."

In July 1992, plaintiffs filed a first amended petition for writ of mandate and complaint for injunctive and declaratory relief. This appeal concerns only the first two causes of action of the petition. In the first cause of action, plaintiffs alleged that the EIR and/or SEIR are legally inadequate under CEQA because they (1) fail to address the potential adverse impacts and cumulative impacts of the project on affordable housing in South Central Los Angeles, (2) do not adequately address all reasonable alternatives to the proposed project, (3) fail to address or disclose the adverse impacts of the project on traffic hazards and circulation in the area, (4) ignore the "growth-inducing impacts of the proposed project," (5) fail to address the potential cumulative impacts of the project and the other projects in the Jefferson attendance area on the supply of affordable housing in the area, (6) fail to disclose the significant adverse economic and social impacts associated with the project, (7) fail to address the issue of the inconsistency of the proposed project with the provisions of the General Plan for the City of Los Angeles dealing with the preservation of stable neighborhoods and affordable housing, and (8) do not adequately respond to public comments and questions.

In the second cause of action, plaintiffs alleged that defendants failed to make adequate written findings under Public Resources Code section 21081 and CEQA Guidelines sections 15088 and 15089 (Cal. Code Regs., tit. 14, §§ 15088 and 15089; hereinafter referred to as Guidelines) pertaining to mitigation measures and the economic and social considerations affecting mitigation measures. Plaintiffs also challenged the sufficiency of the evidence supporting the findings "regarding the absence of significant adverse environmental impacts or feasible alternatives, the feasibility of the project, and the presence of benefits that override any adverse impacts."

Both sides filed memoranda of points and authorities on the foregoing issues; after hearing on February 10, 1993, the matter was submitted. On March 2, 1993, the court issued a ruling denying the petition for writ of mandate as to the first and second causes of action. The ruling stated that "Under the substantial evidence and prejudicial abuse of discretion tests set forth in *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278], moving parties have failed to demonstrate, in light of the entire record, responding party's decision is not supported by substantial evidence." The court also specifically concluded that moving parties failed to present sufficient evidence that the EIR was inadequate, that the SEIR adequately considered the socio-economic effect of residential displacement, that there was an adequate discussion of alternative plans under Public Resources Code section 21061, and that the findings regarding mitigation measures adequately deal with the loss of housing.

Plaintiffs filed timely notice of appeal from the order denying the petition for writ of mandate as to the first and second causes of action. On appeal, appellants claim the SEIR is legally inadequate under CEQA with respect to the issues of the cumulative impact of the project, mitigation of housing loss, and a study of alternative sites for the Jefferson 3 school. Appellants also claim that respondents abused their discretion in (1) refusing to respond to the suggestion by the author of the SEIR to reopen the site selection process in the wake of the 1992 civil disturbances in which many stores and businesses had been burned, creating new vacant sites in the area, and (2) in failing to adequately explain the finding that mitigation is infeasible.

I

ADEQUACY OF SEIR

"The standard of review of whether an agency has complied with CEQA requirements governing consideration of alternatives and mitigation measures in adopting an EIR is determined by Public Resources Code section 21168.5. [Citation.] The inquiry 'shall extend only to whether there was a prejudicial abuse of discretion' by the public agency. 'Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (Pub. Resources Code, § 21168.5.)" (*Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 738 [22 Cal.Rptr.2d 618].)

"A reviewing court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative

document. . . . 'Under CEQA, an EIR is presumed adequate (Pub. Resources Code, § 21167.3), and the plaintiff in a CEQA action has the burden of proving otherwise.' " (*Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners, supra,* 18 Cal.App.4th at p. 740.)

█ " 'The EIR is an informational document with the stated purpose of providing public agencies and the public with "detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." [Citations.]' . . . Technical perfection is not required; the courts have looked not for an exhaustive analysis but for adequacy, completeness and a good-faith effort at full disclosure." (*Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351, 368 [7 Cal.Rptr.2d 307].)

A. *Cumulative Impact*

█ Appellants contend that the SEIR is inadequate because it fails to provide sufficient information on the cumulative housing stock loss threatened by the activities of the District and other agencies, although appellants concede that the SEIR "appropriately identifies the loss of low income housing units as a significant cumulative environmental impact of the proposed school project." Appellants argue that the SEIR's discussion of cumulative impacts must reflect the severity of the cumulative impacts not just in the Jefferson attendance area, but throughout South Central Los Angeles, in order to provide meaningful information to the Board and the public.

The SEIR, excluding over 150 pages of appendices, contains 125 pages. An entire section of the SEIR (about 13 pages) is devoted to the topic of population and housing. That section discusses studies and provides statistics as to housing availability and vacancy rates in the "primary housing area," and a "secondary housing area." The primary area is the neighborhood immediately surrounding the project site and is located within the area served by the zip code 90037; the secondary area consists of the surrounding area of the Jefferson attendance area, and is within an area served by an additional five zip codes. The SEIR notes that the primary area has an overall average vacancy rate of 2.1 percent; the secondary area overall vacancy rate is 2.0 percent; the low vacancy rates show that the housing market in the Southeast Los Angeles Planning District is very limited, with replacement housing difficult to find. The SEIR provides statistics on the availability and cost of housing for sale in the Jefferson 3 project area, as well as housing for rent in the area. The SEIR also acknowledges that in

addition to the 67 dwelling units displaced by the project in the primary area, an additional 91 units would be displaced by other projects in the secondary area, for a total cumulative housing displacement of 158 units. The SEIR concludes that "The impact of a reduction in 67 total dwelling units would be considered a significant adverse impact on housing in the local area. In fact given the shortage of vacant housing even a much smaller reduction in the current housing supply would be considered a significant adverse impact on housing resources in the local area. [¶] The cumulative impact of all of the LAUSD Jefferson attendance area school projects . . . indicates the displacement of an estimated 158 units in this area. Because of the low vacancy rate in this area, and the relatively high percentage that these units represent compared to all vacant units available in the area, the cumulative impact is considered significant."

The SEIR also recognizes that the project would cause a significant loss of affordable housing in the local area and there would be a significant cumulative loss of affordable housing in South Central Los Angeles, and that these impacts remain significant "despite the mitigation measures required of the project."

We reject appellants' claim that the SEIR understates the severity and significance of the cumulative impact of the project on housing loss in the Jefferson attendance area. Appellants contend that the figure of 91 units is "indefensibly low" and does not reflect all reasonably anticipated future projects of LAUSD or projects of other agencies. Accompanying appellants' petition were the declarations of Margaret Diop, an associate planner for the City of Los Angeles from 1989 to 1991, and Paul Lee, an attorney with the Legal Aid Foundation of Los Angeles. Diop declared that transit agencies are undertaking projects near the Jefferson attendance area, including a project to widen a portion of the Harbor Freeway south of the Vernon Avenue exit, an area "immediately adjacent to the Jefferson attendance area," and that the California Department of Transportation (CALTRANS) "has or will acquire several hundreds of parcels of land through eminent domain in order to complete this project." It is unclear from Diop's declaration whether of the properties sought to be acquired by CALTRANS are dwelling units.

Lee declared that in connection with a project for a new police substation (the Newton Substation Project) in the area of East 34th Streets and Central Avenue (in the secondary study area), the police department "has targeted" seven single-family dwelling units and three commercial parcels "for acquisition and demolition." Lee provides no information on the stage of development of this project or whether it has even been approved by the City of

Los Angeles. An EIR need not contain discussion of specific future action that is merely contemplated nor a gleam in a planner's eye. (*Del Mar Terrace Conservancy, Inc.* v. *City Council* (1992) 10 Cal.App.4th 712, 738 [12 Cal.Rptr.2d 785].)

There is no indication in our record that the figure of 91 lost dwelling units does not include losses from all reasonably anticipated future projects of the District. As to projects of other agencies, the only concrete information supplied by appellants is the anticipated loss of seven units due to a new police substation in the area. ■ The absence of this information from the SEIR " 'does not per se constitute a prejudicial abuse of discretion.' " (*Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners, supra*, 18 Cal.App.4th 729, 749.) A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process. (*Id.* at p. 748.) If the EIR, read as a whole, adequately deals with the question of cumulative impacts, it will suffice. (*Ibid.*) " 'Absolute perfection is not required'; instead the level of analysis 'is subject to a rule of reason.' " (*Ibid.*)

■ In this case, the SEIR acknowledged that the project would have a significant adverse impact on the stock of affordable housing in the local area and a cumulative impact on the loss of housing in South Central Los Angeles. Appellants fail to identify how the omission of more detailed information about other projects in the Jefferson attendance area, or about the housing problem in the larger South Central Los Angeles area, misled the District or the public, or was prejudicial in any way. It cannot be said that the SEIR minimizes or ignores the cumulative impact of the instant project on the availability of affordable housing in the Jefferson attendance area.

Although appellants question the adequacy of the inquiry into projects undertaken by other government agencies in the Jefferson attendance area, the SEIR indicates that contact was made with departments of the City of Los Angeles, the Community Redevelopment Agency, the Rent Stabilization Division, the United States Housing and Urban Development Agency, and the University of Southern California.

We also conclude that the SEIR is not inadequate because it does not study in greater detail the impact of the project on the housing situation in the greater South Central Los Angeles area. This claim assumes an impact in the greater South Central Los Angeles, i.e., that the persons displaced by the project will actually move to other parts of the South Central area and will

not move outside the South Central area entirely or remain in the Jefferson attendance area. The SEIR does not indicate where those persons displaced by the Jefferson 3 project plan to relocate, so the impact on any one part of the greater South Central Los Angeles area is speculative at this point. "As the Guidelines instruct, 'the discussion [of cumulative impacts] should be guided by the standards of practicality and reasonableness.' (Guidelines, § 15130, subd. (b).) . . . 'A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR.' " (*Sacramento Old City Assn.* v. *City Council* (1991) 229 Cal.App.3d 1011, 1033 [280 Cal.Rptr. 478].)

Moreover, appellants do not challenge that portion of the SEIR which explains that "The information available on the status of housing availability, and in particular affordable housing, is fragmentary. There is information on the vacancy rates for census areas. There is currently no tracking system to monitor the loss of affordable housing in Los Angeles. Methods for implementing a tracking system are currently being studied precisely to allow planners to foresee cumulative impacts. No other projects were foreseen, by the City of Los Angeles planners contacted, which are expected to impact housing in South Central Los Angeles. USC indicated it does not intend to acquire any residential property for its expansion program. USC indicated its residential construction program will improve the availability of housing in the USC area. HUD did a search of their data base and found no information specific to Los Angeles."

The SEIR adequately informed the agency and the public of the housing conditions in the greater South Central area with sufficient detail to "enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project." (*Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650].) As explained below, the SEIR meets the requirement in Guidelines section 15130, subdivision (b)(1)(B) that the SEIR contain a summary of projections contained in an adopted general plan or related planning document which is designed to evaluate regional or area-wide conditions. (221 Cal.App.3d at p. 722.)

The SEIR explains that the Southeast Los Angeles District Plan, part of the City of Los Angeles General Plan, commits the City to redirect its energies to improve the declining Southeast Los Angeles District by focusing on (1) poverty and unemployment, (2) serious deficiencies in educational achievement, and (3) lack of adequate community safety. The District plan identifies the low level of educational achievement as a crucial issue contributing to the problems of the District and states that most of the existing

school facilities and site sizes in the Jefferson attendance area are outmoded, overcrowded, and not up to current standards. The District plan characterizes the need to upgrade the educational environment to be of "extreme importance."

As to the issue of housing, the District plan notes that nearly half the dwelling units in the District were built before 1940; some units require maintenance, some require rehabilitation, and a few are structurally unsafe and should be demolished; there is a much higher than average number of unoccupied dwelling units which should be rehabilitated and reoccupied; low rent housing is concentrated in the District, where residents are economically limited in terms of housing choice. The District plan calls for the preservation and upgrading of housing.

In light of the District plan, the SEIR forthrightly admits that "In the case of Jefferson New Elementary School No. 3 there is a conflict between the goals for education and the goals for housing. The need to build more elementary schools to relieve severe overcrowding has led to the proposal that this new school should displace existing housing. This is the primary planning issue which has led to the preparation of this document."

We conclude that substantial evidence supports the conclusion that the SEIR represents a good faith effort at full disclosure on the issue of the project's impact on housing in the Jefferson attendance area as well as in the larger community. Although not exhaustive (*Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d at p. 712), the SEIR is adequate as an informative document and affords a basis for meaningful consideration of the issue of the cumulative impacts of the project on housing.

B. *Mitigation of Housing Loss*

Appellants contend that the SEIR fails to discuss measures to mitigate the loss of affordable housing caused by the project. Appellants acknowledge that the SEIR sets out four mitigation measures: (1) paying property owners fair market value for the property acquired by the District, (2) affording relocation assistance to residents and business occupying the acquired properties, pursuant to the California Relocation Assistance and Real Property Acquisition Act of 1970, (3) surveying residents, such as elderly or handicapped persons, with need of special assistance for relocation, and (4) monitoring the relocation efforts with follow-up interviews. The SEIR admits that even after implementation of the foregoing measures, "the reduction of local housing supply and cumulative impacts on reduction of the area housing supply are expected to remain significant."

Appellants maintain that the relocation measures do nothing to mitigate housing loss, and that the SEIR is inadequate for failing to discuss the possibilities of building replacement housing, putting money in a housing fund, working with nonprofit corporations or other government agencies to rehabilitate existing housing, or seeking state or federal subsidies for affordable housing. They argue that "While there may be some question over whether the District itself could condemn land to build housing, surely some mitigation measures are possible."

■ Although an EIR must identify proposed mitigation measures for adverse effects of the project, " 'CEQA does not require analysis of every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects.' " (*Rio Vista Farm Bureau Center* v. *County of Solano, supra,* 5 Cal.App.4th at p. 376, italics in original.) Feasible is defined in Public Resources Code section 21061.1 as capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors. Guidelines section 15364 defines feasible as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, legal, social, and technological factors." As stated in *Rio Vista,* the statute does not demand what is not realistically possible, given the limitation of time, energy and funds. (5 Cal.App.4th at p. 376.)

■ We reject appellants' claims that the SEIR is inadequate in its treatment of mitigation measures. The discussion of mitigation measures in the SEIR must be assessed in accordance with the "rule of reason" and in light of the principle that our role is merely to determine whether the SEIR is sufficient as an informational document. Given the speculative nature of the relocation plans of the residents displaced by the Jefferson 3 project, and the lack of any information in the SEIR concerning specific housing projects planned or undertaken by other agencies in the Jefferson attendance area, there is insufficient evidence to support the claim that District should have discussed the issue of collaboration with other agencies to provide housing in the area. It is clear from section 4.1 of the SEIR, captioned "Land Use and Relevant Planning," as well as from the section on population and housing, that the availability of affordable housing was a serious problem of citywide concern which realistically could not be solved on a piecemeal basis. (See, e.g., *Laurel Hills Homeowners Assn.* v. *City Council* (1978) 83 Cal.App.3d 515, 526-527 [147 Cal.Rptr. 842].) A reasonable inference is that other agencies, including the City of Los Angeles, were "subject to the policies and programs outlined in the Southeast Los Angeles District Plan," which is

intended to "commit the City to the redirection of its energies toward the improvement and upgrading of declining areas of Los Angeles in general and the Southeast Los Angeles District in particular." In light of the provisions of the general plan for the City of Los Angeles, as well as the provisions of the Southeast District Plan, District did not abuse its discretion in failing to discuss the additional mitigation measures suggested by appellants.

Appellants argue that "While there may be some question over whether the District itself could condemn land to build housing, surely *some* mitigation measures are possible," and that Education Code section 35160 constitutes a "broad grant of power" to "enable a school district to engage in planning to mitigate the loss of low income housing caused by its own projects." The claims that the District was obligated to consider the mitigation measures of funding replacement housing or building replacement housing itself are novel claims offered without any applicable legal authority to establish that such measures are economically or legally feasible.

"CEQA does not grant an agency new powers independent of the powers granted to the agency by other laws." (Guidelines, § 15040, subd. (b).) "Where another law grants an agency discretionary powers, CEQA supplements those discretionary powers by authorizing the agency to use the discretionary powers to mitigate or avoid significant effects on the environment when it is feasible to do so with respect to the projects subject to the powers of the agency." (Guidelines, § 15040, subd. (c).) Within the limitations described in Section 15040, a lead agency for a project has authority to require changes in any or all activities involved in the project in order to avoid significant effects on the environment. (Guidelines, § 15041, subd. (a).)

We are aware of no authority which would *require* the District, under the circumstances of this case, to consider a mitigation measure which itself may constitute a project at least as complex, ambitious, and costly as the Jefferson 3 project itself. Appellants' citation to Health and Safety Code section 33413, subdivision (a), is inapposite, as it applies to redevelopment agencies, not school districts. Moreover, it is unnecessary for us to determine whether Education Code section 35160 is broad enough to permit the District to undertake the mitigation measures suggested by appellants. "A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. [Courts] have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily

prescribed standard of review permitted us to do so." (*A Local & Regional Monitor* v. *City of Los Angeles* (1993) 16 Cal.App.4th 630, 646 [20 Cal.Rptr.2d 228].) The standard of review is not de novo but the traditional, deferential substantial evidence test under Public Resources Code section 21168.5. (16 Cal.App.4th at pp. 638-639.) Under Public Resources Code section 21168.5, our inquiry extends only to whether there was a prejudicial abuse of discretion; such abuse is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence. (16 Cal.App.4th at p. 639.)

As an EIR must only consider "a reasonable range of project alternatives and mitigation measures" (*Rio Vista Farm Bureau Center* v. *County of Solano, supra*, 5 Cal.App.4th at p. 379), we conclude that the mitigation measures considered in the SEIR were adequate. We also reject appellants' contention that even if the measures they suggest are infeasible, the SEIR is inadequate for failing to discuss in detail these infeasible mitigation measures. Under the circumstances in this case, the District's failure to discuss *infeasible* mitigation measures does not constitute a prejudicial abuse of discretion, and our discussion of the matter now is not, as urged by appellants, a *post hoc* rationalization or postapproval environmental review.

C. *Alternative Sites*

■ Appellants contend that District "abused its discretion by refusing to respond on the record to the suggestion of the author of the SEIR to reopen the site selection process, and by the SEIR's otherwise inadequate discussion of alternative sites."

The SEIR was made available for comment in February 1992; the review period ended April 3, 1992. In addition to the preferred project site at Broadway and 47th Streets, the SEIR analyzed and evaluated six alternative sites for the school. Three of the alternative sites were being used as park or recreation areas, one alternative site was other property owned by District and being used for maintenance and storage, one site was vacant, and one site on Avalon and 43rd Street was a mixture of residential and commercial buildings.

In late April and early May 1992, Los Angeles experienced civil disturbances or riots. On May 13, 1992, planner Dwayne Mears of the planning Center, which prepared the SEIR for District, wrote a letter to the District stating that a new shopping center across the street from the project site had been burned, as well as the swap meet building on the site itself, and concluding that "the new situation created by the destruction caused by the

riot affects at least two aspects of the EIR. The relocation impact would now be much less since the swap meet businesses no longer can use the site. . . . However, having so many area stores and shopping centers burned may be a more important difference. The site selection process was done several years ago and now there may be additional vacant sites within the service area for Jefferson No. 3. I think a strong case can be made that it would be environmentally superior to utilize a burned out commercial site for a school, thus avoiding the project's significant residential displacement impacts. Since there may now be another site available that would avoid the project's significant impacts while meeting the site requirements, the site selection process should be reopened or else the EIR will be open to challenge. If I were suing LAUSD I think I could win on that issue."

According to the declaration of Robert Niccum, Director of Facilities, Planning and Real Estate for the District, state guidelines suggest that the size of a new elementary school site should be 10 acres or more; because of the difficulty in finding sites of that size in an urban environment, District guidelines permit smaller sites, typically about 5 acres; the site at issue here is slightly smaller than that, being about 4.6 acres; as a result of the Los Angeles riots, during the week of May 4, 1992, he drove through the Jefferson 3 service area, a neighborhood bordered by Vernon Avenue, Main Street, Slauson Avenue, and Broadway; fires had destroyed several isolated commercial buildings, but he did not observe any fire damage that was large enough, or concentrated enough, to cover an entire 4.6 acre site; he concluded that the riots did not create any additional sites that should be considered by the District as potential sites; later in May, the letter from the planning center was brought to his attention; because he had already conducted such an investigation, he knew that there had been no change of circumstance respecting the area that affected the sufficiency of the SEIR's discussion of alternative sites; he advised District staff that such an investigation was not necessary and he did not authorize one.

Our record does not support the charge by appellants that the District "ignored the advice of the author of the SEIR to reopen the site selection process." Rather, our record shows that independently of any suggestion in the May 13, 1992, letter, Mr. Niccum did precisely what the letter recommended: "The neighborhood should be resurveyed for potential school sites."

Although appellants do not challenge Mr. Niccum's conclusions, they contend that his opinion should have been shared with the Board or the public and should have been discussed in the SEIR. Under the circumstances

of this case, the District was not required to hold a hearing on the issue of whether the site selection process should be reopened after the civil disturbances. (*A Local & Regional Monitor* v. *City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1804-1805 [16 Cal.Rptr.2d 358].)

Nor was the District required to discuss the results of Mr. Niccum's investigation in the SEIR. As Mr. Niccum discovered, the civil disturbances did not create any new potential sites. An EIR does not have to contain the results of unfruitful investigations or pursuits down blind alleys, but only "an analysis of those alternatives necessary to permit a reasoned choice" (*Rio Vista Farm Bureau Center* v. *County of Solano, supra,* 5 Cal.App.4th at p. 378), and which are feasible, i.e., capable of being accomplished in a successful manner. (*Id.* at p. 376.)

To the extent that appellants contend that the civil disturbances required the preparation of a subsequent report under the provisions of Public Resources Code section 21166, we reject such contention. On this record, we can only conclude that the actions of the Board in certifying the SEIR were quasi-legislative in character and that the proper form of judicial review of the action lies in traditional mandamus under Public Resources Code section 21168.5 and Code of Civil Procedure section 1085. (*Del Mar Terrace Conservancy, Inc.* v. *City Council* (1992) 10 Cal.App.4th 712, 729 [12 Cal.Rptr.2d 785].) The trial court was therefore justified in receiving additional evidence, such as Mr. Niccum's declaration, outside the administrative record concerning the SEIR. (*Ibid.*) We conclude that the record before the trial court contains substantial evidence to support the conclusion that the civil disturbances did not provide "new information," (Pub. Resources Code, § 21166, subd. (c)) and did not constitute substantial changes in the circumstances of the project (Pub. Resources Code, § 21166, subd. (b)) so as to require modifications in the SEIR. (See, e.g., *Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1318 [8 Cal.Rptr.2d 473]; *A Local & Regional Monitor* v. *City of Los Angeles, supra,* 12 Cal.App.4th at pp. 1802-1803, 1806.)

We also reject appellant's contention that the SEIR's discussion of alternative sites is defective in that it "operates under a double standard," treating problems with alternative sites as insurmountable, yet at the same time ignoring or promising to mitigate identical problems with the preferred site. Appellants here do not appear to be challenging the depth and detail of the SEIR's discussion of alternative sites, but only appear to complain about the fact that District approved the project at its preferred site and concluded that the alternatives were infeasible and less desirable. Appellants' contention is not cognizable under the appropriate standard of review.

"CEQA is more or less a procedural scheme that makes no guarantees that environmental considerations will prevail." (*Save San Francisco Bay Assn.* v. *San Francisco Bay Conservation etc. Com.* (1992) 10 Cal.App.4th 908, 923 [13 Cal.Rptr.2d 117].) The reviewing court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document. (*A Local & Regional Monitor* v. *City of Los Angeles, supra,* 16 Cal.App.4th at p. 639.) We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. (*Ibid.*)

Moreover, appellants appear "to be laboring under the misconception that the identification of adverse environmental impacts is the equivalent of a legal mandate to refuse to approve and certify the EIR." (*A Local & Regional Monitor* v. *City of Los Angeles, supra,* 16 Cal.App.4th at p. 645.) "Under CEQA's environmental review, if a project will lead to 'significant environmental effects,' the public agency cannot approve the project unless it adopts 'mitigation measures' which 'would substantially lessen the significant environmental effects.' [Citation.] In situations where a project's benefits outweigh its impacts, CEQA Guidelines section 15093 allows the certifying agency to approve the EIR, despite the inability to fully mitigate, by adopting a statement of overriding considerations. Thus, so long as it has made an informed decision in adopting a statement of overriding considerations, an agency need not require mitigation." (*A Local & Regional Monitor* v. *City of Los Angeles, supra,* 12 Cal.App.4th at p. 1807.)

In the instant case, the Board adopted the finding that, with respect to the project's impacts on housing, "specific economic, social, and other considerations make further reduction of these impacts or adoption of alternatives avoiding these impacts infeasible." The Board also adopted a statement of overriding considerations finding that "to the extent that any impacts attributable to the project remain unmitigated, such impacts are acceptable in light of the overriding social, economic and other benefits set forth here, in the EIR and in the Administrative Record. The LAUSD Board finds that the alternatives set forth in the EIR are infeasible and less desirable than the project itself. The LAUSD Board finds that the project's benefits outweigh the unmitigated impacts and justify approval of the project."

We conclude that substantial evidence supports the conclusion that the District proceeded in the manner required by law. To the extent that appellants suggest that the District proceeded improperly by selecting a preferred school site *before* drafting the SEIR, a similar contention was considered and rejected by the court in *Stand Tall on Principles* v. *Shasta Union High Sch.*

*Dist.* (1991) 235 Cal.App.3d 772, 783-784 [1 Cal.Rptr.2d 107].) Appellants' challenges to the SEIR based on the issue of alternative school sites are without merit.

II

ADEQUACY OF FINDINGS

 Appellants contend that the District's statement of facts and findings and statement of overriding considerations as to the issue of mitigation of housing loss (Pub. Resources Code, § 21081, subd. (c)), is inadequate. Appellants claim the finding—"that specific economic, social, and other considerations make further reduction of these impacts or adoption of alternatives avoiding these impacts infeasible"—is conclusionary, did not explain why mitigation was infeasible, and did not disclose the analytic route the agency traveled from evidence to action.

"A statement of overriding considerations reflects the final stage in the decisionmaking process by the public body. A public agency can approve a project with significant environmental impacts only if it finds such effects can be mitigated or concludes that unavoidable impacts are acceptable because of overriding concerns. (Pub. Resources Code, § 21081; Guidelines, §§ 15091 and 15092.) If approval of the project will result in significant environmental effects which 'are not at least substantially mitigated, the agency shall state in writing the specific reasons to support its action based on the final EIR and/or other information in the record.' (Guidelines, § 15093, subd. (b).) These reasons constitute the statement of overriding considerations which is intended to demonstrate the balance struck by the body in weighing the 'benefits of a proposed project against its unavoidable environmental risks.' (Guidelines, § 15093, subds. (a) and (c).)" (*Sierra Club* v. *Contra Costa County* (1992) 10 Cal.App.4th 1212, 1222 [13 Cal.Rptr.2d 182].)

While the mitigation and feasibility findings typically focus on the feasibility of specific proposed alternatives and mitigation measures, the statement of overriding considerations focuses on the larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like. (*Sierra Club* v. *Contra Costa County*, *supra*, 10 Cal.App.4th at p. 1222.) A statement of overriding considerations must be supported by substantial evidence contained in the final EIR and/or other information in the record. (*Id.* at p. 1223.)

We first must properly interpret the finding challenged by appellants. As we interpret the finding made by the District in this case, the District found

that despite the mitigation measures set out in the SEIR, the project would still cause a significant effect on housing in the area, which problem would remain after implementation of the mitigation measures; additional or further measures to mitigate housing loss are infeasible due to economic, social and other considerations. This interpretation of the finding is supported by viewing the statement of facts and findings as a whole, including the section dealing with alternatives to the proposed project. To the extent that appellants interpret the finding to be that the mitigation measures set out in the SEIR are infeasible, that interpretation is clearly erroneous, as the mitigation measures set out in the SEIR were *adopted* in the mitigation monitoring plan; it was only *further* or *additional* mitigation measures to reduce housing loss which were determined to be infeasible.

As properly interpreted, the findings as to housing loss under Public Resources Code section 21081, subdivision (c), are adequate. As set out in Guidelines section 15091, subdivision (a), the finding as to each significant environmental effect of a project is to be "accompanied by a brief explanation of the rationale for each finding." In this case, the finding that housing loss would remain unmitigated is immediately preceded by the explanation that "Despite the detailed consideration given to the project's impacts on land use changes and housing, and the mitigation specified, these impacts remain significant. These significant impacts include the effects on persons displaced and a significant loss of affordable housing in the local area. This also includes a significant cumulative loss of affordable housing in South Central Los Angeles, as caused by this and other projects in the region."

The foregoing explanation is sufficient to advert to the region-wide housing problem in South Central Los Angeles, the low vacancy rate, and the host of economic and social problems confronting this low-income, minority neighborhood. All of these factors are discussed in detail in the SEIR and are the specific "economic, social, and other considerations" which explain why the mitigation measures set out in the SEIR would not be successful in mitigating the project's effect on housing loss. These same extensive and complex social and economic problems also explain why further mitigation measures would be infeasible for the District to accomplish, given the narrow focus and purpose of the instant project.

Further, in this case, there is no doubt as to the District's "larger, more general reasons for approving the project," despite unavoidable impacts on housing. As stated in the statement of overriding considerations, the project is "in response to the need for educational facilities in an area of the School District that is experiencing overcrowded school facilities and high enrollment. . . . The LAUSD finds that a new elementary school is needed to

avoid overcrowding at other elementary schools in the area and provide a healthy atmosphere of public education. [¶] . . . [T]o the extent that any impacts attributable to the project remain unmitigated, such impacts are acceptable in light of the overriding social, economic and other benefits set forth here, in the EIR and in the Administrative Record."

Substantial evidence in the SEIR supports the foregoing findings, which are sufficient to demonstrate the balance struck by the District in weighing the benefits of the proposed project against its unavoidable adverse impacts on housing.

We thus conclude that appellants' challenges to the adequacy of the SEIR are without merit. The findings made by the District are adequate under CEQA and supported by substantial evidence in the record. The trial court properly denied the petition for writ of mandate on the first and second causes of action.

DISPOSITION

The order is affirmed.

Johnson, J., and Woods (Fred), J., concurred.