[No. E024373. Fourth Dist., Div. Two. Aug. 18, 2000.]

CADIZ LAND COMPANY, INC., Plaintiff and Appellant, v.
RAIL CYCLE, L.P., et al., Defendants and Respondents.

[No. E024532. Fourth Dist., Div. Two. Aug. 18, 2000.]

CADIZ LAND COMPANY, INC., Plaintiff and Respondent, v.
COUNTY OF SAN BERNARDIONO et al., Defendants and Appellants.

## COUNSEL

Jeffer, Mangels, Butler & Marmaro, Benjamin M. Reznik, John M. Bowman, John E. Mackel and Lynne Todd Edgerton for Plaintiff and Appellant and for Plaintiff and Respondent.

LeBoeuf, Lamb, Greene & MacRae, Richard R. Terzian, Stephen P. Pfahler and Robert J. Tyson for Defendants and Appellants.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Nabil L. Abu-Assal, Tonie M. Franzese, David J. Altman and Clare Bronowski for Defendants and Respondents.

## OPINION

GAUT, J.—Appellant Cadiz Land Company, Inc. (Cadiz)[1] challenges under the California Environmental Quality Act (CEQA)[2] the County of San Bernardino's certification of an environmental impact report and related

---

[1]Cadiz previously used the name of Pacific Agriculture Holdings, Inc. (Pacific Agriculture).

[2]Public Resources Code section 21000 et seq.

approval of Rail Cycle, L.P.'s proposed landfill project (landfill).[3] The proposed landfill site is located in the Mojave Desert region of San Bernardino County (County). Cadiz owns agricultural land within the near vicinity of the proposed landfill site, and asserts that the landfill will have significant adverse impacts on its agricultural operations and will contaminate the groundwater.

We conclude the failure to discuss in the EIR (environmental impact report) the volume of groundwater subject to contamination renders the EIR inadequate under CEQA. Because the EIR is deficient, a revised and recirculated EIR is necessary.

With regard to Cadiz's other contentions, we conclude they are either without merit or moot. The County's consolidated appeal of the trial court's ruling denying the County's motion for attorneys' fees is also moot.[4]

I. *Statement of Facts and Procedural Background*

We reserve a detailed account of the facts for the discussion portion of this opinion. A basic outline of the facts is nevertheless provided to frame the issues. Also provided are maps, attached as appendices A and B, which show the landfill site in relation to Cadiz's property and the approximate area of the underlying aquifer.

The landfill site, which is the subject of this matter, consists of approximately 4,870 acres of land located in an area known as Bolo Station, adjacent to Bristol Dry Lake and a rail line between the towns of Amboy and Cadiz, in the southeastern Mojave Desert region of the County. The site is three miles across, east to west, and four miles across, north to south, at its greatest dimensions, and is relatively flat. On this site, Rail Cycle, L.P. (Rail)[5] proposes to build a class III nonhazardous municipal solid waste disposal facility, with a service life of 60 to 100 years. Twenty-one hundred acres of the landfill site are to be allocated to the landfill, with 300 acres for support facilities, and the remaining 2,470 acres to be a buffer area. When fully operating, the landfill will receive up to 21,000 tons of garbage per

[3]Jerry Smith, a resident of Twentynine Palms and member of the Desert Environmental Response Team, also brought an action challenging the County of San Bernardino's approval of the landfill project. The trial court consolidated Smith's action with the County of San Bernardino's action. Smith is not a party to this appeal.

[4]On this court's own motion, Cadiz's and the County's appeals (case Nos. E024373 and E024532) were consolidated solely for the purpose of appeal.

[5]Rail Cycle is a limited partnership between Atchison, Topeka, and Santa Fe Railway Company, Inc., and Waste Management, Inc. In May 1993, Waste Management of North America, Inc. (WMNA) became known as Waste Management, Inc. (WMI). WMNA owns WMNA, Rail-Cycle Sub, Inc., which is the general partner of defendant Rail Cycle, a limited partnership. WMNA Rail-Cycle Sub, Inc., is owned by WMX Technologies, Inc., formerly WMI.

day, contained in closed containers and transported primarily by train from Southern California counties. At completion, the landfill will rise an estimated 370 to 380 feet above the original ground level.

Atchison, Topeka, and Santa Fe Railway Company, Inc., owns the majority of the landfill site land. The federal government owns, and the United States Bureau of Land Management (BLM) manages, 1,600 acres of the landfill site property. The project thus requires a land exchange, an amendment to the California Desert Conservation Area Plan, and both county and federal government approval.

Nearby, approximately one mile east of the landfill site, Cadiz owns 26,000 acres of agricultural land. Of this land, 1,440 acres contains vineyards and citrus orchards, which are approximately four to five miles east of the landfill site. In 1993, the County certified an EIR and approved a general plan amendment reclassifying 9,600 acres of Cadiz's land as agricultural land, thus allowing for expansion of Cadiz's existing agricultural operations. The newly designated agricultural land is approximately two miles east of the proposed landfill site.

Cadiz uses the groundwater in an aquifer underlying the landfill and Cadiz's land for its agricultural operations, and also intends to extract the groundwater and sell it to the Mojave Water Agency (MWA). In January 1994, Cadiz and MWA entered into a memorandum of understanding in which Cadiz and MWA agreed that Cadiz "is willing to sell a portion of such surplus water to MWA on a long-term basis, provided mutually satisfactory terms and conditions for a sale can be reached . . . ." Cadiz and MWA further agreed "to work together in good faith and without delay during the next six months to engage in preliminary planning studies for a proposed contract for the purchase by MWA from [Cadiz] of a minimum of 30,000 acre-feet per year of water" at a price to be agreed upon, and that a final contract would be entered into following compliance with CEQA.

Meanwhile, in 1991 Rail applied for a conditional use permit and related amendments to the County's general plan for the purpose of constructing the landfill. An EIR and environmental impact statement (EIS) were prepared[6] pursuant to CEQA and the National Environmental Policy Act.[7] The County was designated the lead agency in preparing the EIR/EIS. In August 1991,

---

[6]The EIR and EIS were prepared by Environmental Solutions, Inc., an independent environmental consultant under the supervision of the County and the BLM.

[7]42 United States Code section 4321 et seq.

the County Planning Department issued a notice of preparation of a joint EIR/EIS.[8]

In November 1992, the draft EIR/EIS (DEIR) was circulated to the public and governmental agencies for review and comment. During the 90-day review and comment period, BLM held three public hearings. The County and BLM decided to prepare a supplement to the DEIR (SEIR), responding to issues not fully addressed in the DEIR. In December 1993, the County distributed to the public and governmental agencies the SEIR for review and commentary. Rail submitted various technical reports considered in preparation of the SEIR. A final EIR/EIS (FEIR) was circulated in July 1994. It included the DEIR, SEIR, and responses to public comments on the DEIR and SEIR. A mitigation monitoring and compliance program was also prepared. After a series of public hearings, the County Planning Commission (CPC), on November 21, 1994, recommended board approval of Rail's landfill project and certification of the EIR.[9]

Cadiz appealed the CPC's decision to the County Board of Supervisors (Board), and in May 1995 the Board held public hearings on Rail's landfill applications and Cadiz's appeal. Additional technical reports were submitted to the Board and expert testimony was provided during the Board's hearings on Cadiz's appeal.

On November 21, 1995, the Board denied Cadiz's appeal and certified the EIR. On November 28, 1995, the Board approved, by a three-to-two vote, Rail's application for a conditional use permit (CUP) to build the landfill; approved general plan amendments to designate a portion of the dump site as "resource conservation" land and to identify the site as a landfill on the infrastructure overlay map of the general plan; and approved a County "business agreement" with Rail, whereby Rail agreed to pay a "business license tax" to the County, subject to voter approval of the tax. The tax was estimated to generate $24 to $30 million annually in County revenues.

In December 1995, Cadiz filed a petition for writ of mandate and a complaint against Rail, the County, the Board, Board Supervisors Marsha Turoci, Barbara Riordan, and Jerry Eaves, and County employee, Philip Smith (County defendants), for declaratory relief, taking of property without just compensation, and deprivation of civil rights under title 42 United States Code section 1983. The first, second, third and fourth causes of action sought mandamus relief to reverse the Board's action approving the landfill. The trial court severed these causes of actions from the remaining damages claims, and set a hearing on the writ claims.

---

[8]Also, in August 1991, the BLM issued a notice of intent to prepare an EIS.
[9]We refer to the certified FEIR as the "EIR."

Following a four-day hearing on Cadiz's writ of mandamus claims, the trial court issued a detailed statement of decision and supplemental statement of findings, denying Cadiz's petition for writ of mandamus relief.

The County defendants and Rail then brought summary judgment motions as to the remaining damages claims. The trial court granted the motions and entered judgment in favor of Rail and the County defendants. The court found that Cadiz's procedural due process claims were not ripe because Cadiz had not suffered any immediate, concrete injury since there had not been voter approval of the business license tax. An election for voter approval of the business license tax was held in March 1996. The voters rejected the tax, and as of the date of the trial court's ruling on the County and Rail's summary judgment motions, the business license tax had not been approved.[10] The trial court denied County's request for attorneys' fees.

## II. *EIR Standard of Review*

Cadiz challenges the adequacy of the EIR under CEQA. ■ In considering whether the EIR is in compliance with CEQA, we are reminded that " 'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." ' [Citations.] [¶] The EIR has been aptly described as the 'heart of CEQA.' ([Cal. Code Regs., tit. 14,] Guidelines, § 15003, subd. (a) . . . .)" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 563-564 [276 Cal.Rptr. 410, 801 P.2d 1161], fn. omitted.) CEQA's purpose is to inform the public and its governmental officials of the environmental consequences of their decisions before they are made. (*Id.* at p. 564.) "Thus, the EIR 'protects not only the environment but also informed self-government.' (*Laurel Heights [Improvement Assn. v. Regents of University of California]* [(1988)] 47 Cal.3d [376,] 392 [253 Cal.Rptr. 426, 764 P.2d 278].)" (*Citizens of Goleta Valley, supra,* at p. 564.)

"Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d 376, 392; *Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 564.)

---

[10]Despite EIR certification and County approval of the landfill project, the landfill project will remain in abeyance until there is voter approval of the business license tax. To date, there have been two unsuccessful attempts to win voter approval.

In reviewing agency actions under CEQA, including findings of adequacy of information contained in the EIR, our inquiry " 'shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' Thus, the reviewing court ' "does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' " (*Laurel Heights, supra,* 47 Cal.3d at p. 392, quoting *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].) We may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable.' Our limited function is consistent with the principle that "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations." ' (47 Cal.3d at p. 393, quoting *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].) We may not, in sum, substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d at p. 564.)

" 'In applying the substantial evidence standard, "the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision." ' (47 Cal.3d at p. 393.) The appellate court's role 'is precisely the same as the trial court's,' and lower court's findings are not 'conclusive on appeal.' (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1076 [230 Cal.Rptr. 413].)" (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 722 [32 Cal.Rptr.2d 704].)

### III. *Adequacy of EIR Discussion of Landfill Environmental Setting and Impacts*

Cadiz contends the EIR should not have been certified because the EIR failed to provide an adequate discussion of the landfill project's environmental setting and potential environmental effects.

An EIR must describe the physical conditions and environmental resources within the project site and in the project vicinity, and evaluate all

potential effects on those physical conditions and resources. (CEQA Guidelines, §§ 15125, 15126.2, subd. (a)[11]; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 952 [91 Cal.Rptr.2d 66].)

The EIR must describe environmental conditions in the vicinity of the project, "as they exist at the time the notice of preparation is published, or if no notice of preparation is published . . . from both a local and regional perspective. This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant. The description of the environmental setting shall be no longer than is necessary to an understanding of the significant effects of the proposed project and its alternatives." (CEQA Guidelines, § 15125, subd. (a).)

Subdivision (c) of CEQA Guidelines section 15125 notes that "Knowledge of the regional setting is critical to the assessment of environmental impacts. . . . The EIR must demonstrate that the significant environmental impacts of the proposed project were adequately investigated and discussed and it must permit the significant effects of the project to be considered in the full environmental context."

According to CEQA Guidelines section 15126.2, "Direct and indirect significant effects of the project on the environment shall be clearly identified and described, giving due consideration to both the short-term and long-term effects. The discussion should include relevant specifics of the area, the resources involved, physical changes, alterations to ecological systems, and changes induced in population distribution, population concentration, the human use of the land (including commercial and residential development), health and safety problems caused by the physical changes, and other aspects of the resource base such as water, historical resources, scenic quality, and public services."

The standard of adequacy of an EIR is further defined in CEQA Guidelines section 15151 as follows: "An EIR should be prepared with a sufficient

[11]"All references to Guidelines are to the state CEQA Guidelines, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.) The Guidelines state: 'These Guidelines are binding on all public agencies in California.' (Guidelines, § 15000.) Although this court has not decided the issue of whether the Guidelines are regulatory mandates or merely aids to interpretation, we have indicated that, '[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.' (*Laurel Heights, supra,* 47 Cal.3d at p. 391, fn. 2.)" (*Citizens of Goleta Valley v. Board of Supervisors, supra,* 52 Cal.3d 553, 564, fn. 3.)

degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts. The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (CEQA Guidelines, § 15151.)

 " '[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA.' " (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* 27 Cal.App.4th at pp. 721-722, quoting *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829 [173 Cal.Rptr. 602].) If the description of the environmental setting of the project site and surrounding area is inaccurate, incomplete or misleading, the EIR does not comply with CEQA. (*San Joaquin Raptor, supra,* at p. 729.) "Without accurate and complete information pertaining to the setting of the project and surrounding uses, it cannot be found that the FEIR adequately investigated and discussed the environmental impacts of the development project." (*Ibid.*)

A. *Adequacy of EIR Discussion of Nearby Agriculture and Related Project Impacts*

Cadiz complains that the EIR does not adequately discuss Cadiz's existing and approved future agricultural operations other than briefly mentioning them in the DEIR.

The DEIR states in the chapter entitled "Affected Environment" that "[r]esidential, military, agricultural, and wilderness land uses are located five or more miles away" from the landfill site. The DEIR further states in the same chapter, in a section entitled "Agriculture" that "The primary agricultural activity in the region is Pacific Agriculture Holdings, Inc. (Pacific Agriculture) [also known as Cadiz[12]], a grape and citrus growing industry with fields situated south of Cadiz between Bolo Station and Cadiz Valley Alternative sites. Pacific Agriculture currently has 1,440 acres of privately held land in crops, including 800 acres in table grapes and 640 acres in citrus. Permanent staff live in trailer homes on the northeastern

---

[12]The SEIR notes that Pacific Agriculture's name changed to Cadiz Land Company, Inc., which is appellant Cadiz.

periphery of Cadiz, while seasonal workers are temporarily housed south of Cadiz. Wells supply water for irrigation and domestic needs. The agribusiness has filed applications with the County for expansion of agricultural development into an additional 3,840 acres of privately held land (six sections) and development of housing and other facilities elsewhere in the vicinity, raising the potential size of the Pacific Agriculture site to 9,600 acres (15 sections of privately held land)."

Rail argues that these DEIR references, as well as various other references to agriculture in the SEIR and FEIR, adequately discuss nearby agricultural uses and impacts in accordance with CEQA. We agree.

In addition to the DEIR references noted above, the DEIR also mentions that Cadiz has two water wells for irrigation 6.5 miles east of the landfill site; Cadiz's "farm near [the town of] Cadiz represents the only sensitive vegetation receptor"; and the proposed action is not likely to result in unacceptable health risks or have significant impacts upon sensitive vegetation. The DEIR also mentions, in discussing cumulative impacts, that Cadiz had a pending application for a proposed project which would increase the area of its agricultural operation from 1,440 to 9,600 acres, "including: [¶]—Additional agricultural lands. [¶]—Permanent staff and seasonal workers housing facilities. [¶]—Pre-cooler/processing, maintenance shop, and containers facilities. [¶] Approximately 2,560 acres will be planted with citrus and the remaining with table grapes. The project is expected to be phased over a five- to ten-year period."[13]

During the DEIR 90-day circulation period (December 4, 1992, to March 3, 1993), Cadiz complained at BLM public hearings (February 8, 10, and 11, 1993) and submitted written comments asserting that the DEIR failed to address adequately significant environmental impacts on Cadiz's agricultural and groundwater interests.

The SEIR included responses to these comments. It acknowledged that Cadiz was proposing to expand its 1,440-acre vineyard and citrus orchard to 9,600 acres over 10 to 15 years, and that this would result in the use of increased groundwater for irrigation, which might result in overdraft of the basin. The SEIR further noted that the landfill's use of groundwater would add to this unavoidable significant adverse impact, and that the landfill's use of 4,870 acres, along with Cadiz's 9,600-acre agricultural expansion, would result in a cumulative impact of removing approximately 14,500 acres from existing land use as open space.

---

[13] At the time of publication the landfill DEIR, Cadiz's DEIR for expansion of its agricultural operation had not yet been published. Cadiz's DEIR was published in June 1993, after publication of the landfill DEIR in November 1992.

In response to the SEIR, Cadiz submitted additional written comments by letter dated February 17, 1994. Cadiz complained that the landfill project was incompatible with Cadiz's agricultural operations and that the EIR failed to evaluate Cadiz's County-approved agricultural expansion project. Cadiz also complained that the DEIR/SEIR failed to provide any evidence supporting its conclusion that the project would have no significant impacts on public health and safety. Cadiz noted its concerns regarding potential contamination of its grapes and citrus, impacts on Cadiz's workers, and potential contamination of the groundwater underlying its land. Cadiz claimed its agricultural site is free of traditional agricultural pests, resulting in minimal use of pesticides but the landfill will detrimentally impact the marketability of Cadiz's produce because of the landfill introducing pests and disease which would necessitate increased use of pesticides. Cadiz further complained that proposed mitigation measures were inadequate.

Following receipt of Cadiz's comments to the SEIR, an agricultural impact report was prepared by Edwin A. Barnes III, Ph.D., in response to Cadiz's complaint that the landfill would introduce agricultural pests and disease which had been nonexistent in the area. Barnes concluded in his report that the proposed landfill would "have minimal, if any, impact on existing or proposed agriculture in the area."

The FEIR summarized issues raised in Barnes's report and noted that "The report addressed the potential for insect/nuisance vectors to be introduced into agricultural zones . . . ." The FEIR also contained related mitigation measures, and concluded that, based on Barnes's report, findings and mitigation measures, the marketability of Cadiz produce was not expected to be affected by the landfill.

In addition to the DEIR, SEIR and FEIR addressing impacts on Cadiz's agricultural operations, the EIR also discusses in general terms the potential environmental impacts of the landfill increasing the presence of insects, rodents and other pests.[14] Related mitigation measures are also included in the EIR.

■ We conclude the EIR adequately discusses the existing agricultural setting and potential significant environmental effects of the landfill project on Cadiz's agricultural operations. (CEQA Guidelines, § 15125, subd. (a).) Although the information contained in the DEIR regarding Cadiz's agricultural operations is sparse, the SEIR sufficiently supplements the DEIR with additional information regarding Cadiz's agricultural operations.

---

[14]Cadiz complains that its land is located downwind from the landfill and this will subject Cadiz's agriculture to insects, spores, and litter carried by the prevailing winds to Cadiz's crops.

Cadiz argues, in reliance on *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109 [71 Cal.Rptr.2d 1], that the landfill EIR's discussion of Cadiz's agricultural land is inadequate because additional information contained in the FEIR cannot be considered in determining the adequacy of the DEIR description of the environmental setting under CEQA Guidelines section 15120, subdivision (c).[15] Cadiz's reliance on *Galante* is misplaced. In *Galante* the Monterey Peninsula Water Management District prepared and published a DEIR, supplemental draft EIR, and FEIR in furtherance of building a dam and reservoir on the Carmel River. In response to the FEIR, individuals submitted written comments and complained at a public hearing that the FEIR did not adequately address the environmental impacts on the local vineyards. Nevertheless, the water district's board of directors certified the FEIR, and later received two addendums to the EIR which were certified and included as part of the EIR.

The trial court issued a peremptory writ of mandate ordering the water district to set aside certification of the FEIR and approval of the dam and reservoir project, and ordered a focused supplemental EIR on viticultural issues before reconsideration of permit approval for the project. On appeal, the *Galante* court affirmed the trial court ruling on the grounds the generalized reference to the local vineyards in the EIR[16] constituted an inadequate description of the environmental setting for the project, thereby precluding a proper analysis of the project's impacts. (*Galante Vineyards v. Monterey Peninsula Water Management Dist., supra,* 60 Cal.App.4th at pp. 1122, 1124.)

The instant case is distinguishable from *Galante*. Here, the SEIR discussed in sufficient detail Cadiz's existing and anticipated agricultural operations and related potential impacts. Also, Barnes's investigation report focusing on such issues was prepared, considered, and discussed in the FEIR. Mitigation measures addressing pests and disease vectors were also considered and adopted.

Cadiz complains that the EIR minimizes Cadiz's proximity to the landfill site by stating that the site is miles away from Cadiz's existing agricultural

[15]CEQA Guidelines section 15120, subdivision (c) provides: "Draft EIRs shall contain the information required by Sections 15122 through 15131. Final EIRs shall contain the same information and the subjects described in Section 15132." CEQA Guidelines section 15125 requires the DEIR to include a description of the environmental setting.

[16]The " 'Land Use, Planning and Recreation' " chapter of the FEIR stated that east and west of the project site there was " '*some grazing, agriculture and scattered rural residential use,*' " and the FEIR described the area in the " 'Climate and Air Quality' " chapter as " '*sparsely populated, with no industry other than several vineyards in the Cachagua Valley.*' " No other references were made in the FEIR to viticulture or wineries. (*Galante Vineyards v. Monterey Peninsula Water Management Dist., supra,* 60 Cal.App.4th at p. 1122.)

operation.[17] But then Cadiz asserts that, regardless of the actual distance between the landfill and Cadiz's land, the distance is immaterial because the potential impacts are regional in scope.

We conclude the EIR adequately discloses the actual distance between Cadiz's existing agricultural operation and the landfill site. Various maps included in the EIR and in technical background reports referenced in the EIR show Cadiz's land in relation to the landfill site. The landfill DEIR, SEIR and FEIR disclose that, although at the time of publication of the DEIR, SEIR and FEIR, Cadiz owned land one mile east of the landfill site, that land was not being used for agriculture. The EIR further states that Cadiz's existing agricultural land was four to five miles from the landfill. The SEIR and FEIR also reveal that the agricultural land, which was the subject of Cadiz's proposed agricultural expansion project, was approximately two miles from the landfill site.

The EIR adequately discusses Cadiz's agricultural operations and related potential landfill effects. We further conclude the EIR's conclusions regarding potential effects on agricultural uses are supported by substantial evidence.

B. *Adequacy of EIR Discussion of Groundwater and Related Landfill Effects*

Cadiz complains that the EIR fails to address the volume of groundwater contained in the aquifer underlying the landfill site, and the potential effects of the landfill on the groundwater. The "summary of environmental setting" does not mention groundwater. Cadiz also complains that the EIR does not mention the potential beneficial future uses of the water, such as future use of the water to supply Southern California counties with surplus water. And, Cadiz claims the EIR erroneously assumes the groundwater "recharge rates" are only 2,200 acre-feet per year and thus the aquifer may be in overdraft. Finally, Cadiz asserts that the EIR erroneously concludes the landfill does not pose a significant adverse impact on the groundwater.

1. *Need for Discussion of Volume of Water in Aquifer*

During the writ hearing, the trial court concluded "the exact quantity of the groundwater underlying the proposed site is not necessary for a meaningful environmental analysis, in this case. The EIR sufficiently discusses

---

[17]While the DEIR initially indicated that agricultural land was not within five miles of the landfill site, whereas the eastern border of land used for agriculture by Cadiz is approximately four miles from the landfill, this discrepancy is clarified in the SEIR and FEIR.

the most important aspects of the groundwater issues, which are, its presence, quality, drawdown and recharge rate, and protection measures. The record reflects significant discussion of these issues . . . ." But the court acknowledged: "one of the problems I'm having with this whole thing is that the enormity of the aquifer as an entity was never really identified. That's the troubling part of that. I mean, just the twenty thousand acre-feet size of it, not identifying that would be considered close to not identifying the wetlands in *San Joaquin* Raptor [*sic*]."

 Although the EIR mentions that an aquifer containing potable water underlies the landfill site, and discusses factors such as groundwater recharge, groundwater down gradient, groundwater flow, change to slope of the water table (hydraulic gradient) due to pumping, risk of contamination, overdraft, projected drawdown, groundwater velocity, and cone of depression location, the EIR does not discuss the volume of water contained in the aquifer or the size of the aquifer. We thus conclude the EIR's discussion of the environmental setting is not in compliance with CEQA Guidelines section 15125.

Subdivision (c) of CEQA Guidelines section 15125 states that "Knowledge of the regional setting is critical to the assessment of environmental impacts. Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project. The EIR must demonstrate that the significant environmental impacts of the proposed project were adequately investigated and discussed and it must permit the significant effects of the project to be considered in the full environmental context."

Despite the landfill EIR's enormity and the length of time devoted to preparing it, the EIR is not in compliance with subdivision (c) of CEQA Guidelines section 15125 because the EIR does not discuss the volume of the aquifer groundwater, particularly potable water, which is a valuable and relatively scarce resource in the region.[18] The EIR does not provide a sufficient description of the environmental setting or adequate information for the public and governmental agencies to evaluate whether the landfill presents a significant adverse impact on the groundwater contained in the aquifer. In order to weigh and evaluate the risk of groundwater contamination, the volume of water subject to contamination is required. Although the

---

[18]According to a groundwater report dated October 2, 1995, prepared by Dennis E. Williams, Ph.D., of Geosciences Support Services entitled, "Technical Memorandum—Modeling Of Ground Water Withdrawal Scenarios—Preliminary Results," portions of the County "are in 'serious and chronic overdraft' regarding their current water supply situation." The memorandum of understanding, dated January 11, 1994, between MWA and Cadiz, also acknowledges that "there is a serious and chronic water shortage in many parts of San Bernardino County, and in particular within the territorial boundaries of the MWA."

CPC and Board conclude the rechargeability of the aquifer water is relatively low and the aquifer is in overdraft, without knowing the volume of water in the aquifer, it cannot be determined how soon depletion will occur. In turn, an informed decision cannot be made as to whether it is worth taking the risk of subjecting a valuable water source to contamination.

The EIR recognizes the possibility of groundwater contamination but concludes it is highly unlikely and, thus, not a significant adverse impact. The EIR states that, in the event of liner leakage, the landfill monitoring and remediation measures would prevent any serious contamination to the groundwater.

During Cadiz's appeal of the CPC's recommendation to approve the EIR, County staff prepared for the Board a report noting the following: Cadiz "has made statements during the EIR process, during the Planning Commission's hearings, and during the Board of Supervisors' hearings regarding the potential for the landfill liner system to fail resulting in the contamination of groundwater. The EIR found that, due to the liner system proposed for Bolo Station, there is only a minimal possibility that groundwater could be contaminated. In the unlikely event of a release through the double liner system, the unsaturated zone monitoring system that would be installed beneath the entire landfill, in conjunction with perimeter monitoring wells, would detect such a release before it could travel offsite. Also, as discussed in the EIR, in the unlikely event of a release, there are known, proven technologies available to mitigate the *groundwater impacts that could occur.*" (Italics added.) County Planning Department staff also acknowledged that they could not guarantee that the liner system would not eventually leak.

According to Williams's report, the aquifer groundwater flow is subject to change upon increasing the amount of water withdrawn from the aquifer and alteration of the cone of depression. Williams's May 9, 1995, groundwater report states that the cone of depression in the groundwater table will reverse direction of groundwater flow due to Cadiz's expanded agricultural development. The need for increased groundwater extraction will cause the groundwater to flow from the landfill site toward Cadiz's property. Williams predicts that leachate from the landfill could reach Cadiz's wells within five years.

Even assuming, as the EIR does, that the aquifer is in overdraft and will dry up, it is not possible to determine how soon and, hence, whether the existing groundwater is worth protecting, without knowing how much water is in the aquifer. The risk of contamination cannot be weighed against the

need to maintain an uncontaminated source of water. For instance, if the water source is depleted within 10 years, then the fact that the liners have only been tested for a 10-year period and might leak thereafter is an insignificant risk. Also, if there is currently little water in the aquifer, the impact of contaminating a relatively small amount of water might be considered not as great a loss as contaminating a voluminous source of drinking water capable of sustaining a large number of people for many years.

An estimate of the volume of groundwater in the aquifer is critical to a well-informed determination of whether the risk of groundwater contamination is worth taking. It would be reasonable to assume that if a large volume of drinking water and/or water suitable for other domestic, industrial, and agricultural uses were subject to contamination, the lead agency evaluating the project would be less inclined to approve such a project and the public might vociferously object to the project.

Certainly the public has a right to know whether a large source of water, which may be used for drinking water[19] and other domestic uses, is being subjected to potential contamination. "Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67]; Guidelines, § 15003, subd. (e).) The EIR process protects not only the environment but also informed self-government." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 392.)

Here, the amount of groundwater at stake must be disclosed to the public and governmental agencies. As the years pass, it is anticipated that the public's demand for water will increase and the potable water contained in the aquifer, if any, will increase in value. It must also be recognized that as time passes and the landfill facilities age, the likelihood of leakage and contamination of the underlying groundwater will increase (even after the landfill ceases operation in 60 to 100 years). Hence, knowledge of the amount of groundwater in the aquifer is crucial to determining approximately when the groundwater will be depleted, assuming the CPC and the Board's findings are accurate that the aquifer is in overdraft.

---

[19]The County staff's report to the Board, entitled "Staff Analysis of Critical Issues For the June 13, 1995 Board of Supervisors' Hearing," states while the groundwater has less than 3,000 mg/L of TDS (total dissolved solids) and is thus a potential municipal or domestic supply of water, the water would require treatment before it could meet EPA's (Environmental Protection Agency) and the state's drinking water standards of 500 mg/L of TDS.

Williams's study, report and testimony, as well as Cadiz's EIR's discussion of the aquifer water volume, show that the landfill EIR could have included an estimate of the groundwater volume in the aquifer. Following Williams's testimony and submission of his report, which contained an estimate of the volume of water in the aquifer, the County should have revised the EIR to include such information, along with a discussion of the estimated date of depletion of the aquifer water. While the record indicates that the Board considered Williams's report and nevertheless concluded the information did not change its view that it should certify the EIR, the EIR should have been revised and recirculated for purposes of informing the public and governmental agencies of the volume of groundwater at risk and to allow the public and governmental agencies to respond to such information.[20]

The EIR's failure to address the volume of groundwater in the aquifer constitutes prejudicial error. "A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process." (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 838 [29 Cal.Rptr.2d 492]; *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650]; see also Pub. Resources Code, § 21005, subd. (a).[21])

Here, the EIR fails to include significant information. The lack of information regarding the volume of the water in the aquifer thwarted the goals of the EIR process by not disclosing to the public and government agencies critical information necessary to evaluate the significance of the landfill's impact on a valuable resource, that of potable water in an arid region. Such deficiency in the EIR constitutes prejudicial error, thereby requiring reversal of the trial court's ruling on Cadiz's writ claims and issuance by the trial court of a writ of mandate setting aside the County's certification of the EIR.

[20]"If, subsequent to the commencement of public review and interagency consultation but prior to final EIR certification, the lead agency adds 'significant new information' to an EIR, the agency must issue new notice and must 'recirculate' the revised EIR, or portions thereof, for additional commentary and consultation. (Pub. Resources Code, § 21092.1; CEQA Guidelines, § 15088.5; *Laurel Heights Improvement Association of San Francisco, Inc. v. Regents of the University of California* (1993) 6 Cal.4th 1112 [26 Cal.Rptr.2d 231, 864 P.2d 502] ('*Laurel Heights II*').)" (Remy et al., Guide to the California Environmental Quality Act (CEQA) (1999 10th ed.) p. 301 (Remy).)

[21]According to Public Resources Code section 21005, subdivision (a), "noncompliance with the information disclosure provisions of [CEQA] which precludes relevant information from being presented to the public agency, or noncompliance with substantive requirements of [CEQA], may constitute a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5, regardless of whether a different outcome would have resulted if the public agency had complied with those provisions."

## 2. *Potential Adverse Effect of Liner Leakage on Groundwater*

Cadiz argues that the EIR incorrectly concludes that groundwater contamination was not a significant adverse impact. Groundwater contamination, according to Cadiz, should have been discussed and identified as an unavoidable risk of the landfill project. Cadiz notes that Williams testified at the May 9, 1995, Board hearing that only four drops of contaminants from the landfill would render the water in an average-size swimming pool unfit to drink.

Since we conclude that the EIR failed to provide critical information regarding the estimated volume of groundwater at risk, and revision and recirculation of the EIR is thus necessary, determination as to whether there was substantial evidence in the EIR supporting the County's determination that contamination was not a significant adverse impact is premature. The record indicates that it is undisputed that there is a possibility of liner leakage at some point. The EIR identifies groundwater contamination as a potential impact and includes, as a mitigating measure, up to $10 million in indemnification for third-party remediation of any contamination of groundwater. There is also evidence that groundwater contamination is possible, although there is evidence that implementation of EIR mitigating measures greatly diminishes that possibility. Since the degree of significance of the adverse effect of groundwater contamination is impacted by the volume of the groundwater resource at stake, it would be premature for us to decide the issue of whether the EIR's designation of the impact as insignificant constitutes reversible error.

## 3. *Change in Groundwater Flow*

Cadiz argues that the County should have revised and recirculated the EIR after receiving Williams's May 9, 1995, report because the report contained significant new information that the groundwater flow would change and flow towards Cadiz's land and wells as a result of Cadiz's anticipated increased groundwater pumping for its extended agricultural operations. Williams concluded that contaminants could reach Cadiz's wells in less than five years. This conclusion contradicted the FEIR comments response which states that it was "physically impossible for any subsurface contamination from the landfill site to affect agricultural properties or any other use of fresh water in the basin. Ground water does not move from the landfill site toward [Cadiz] properties."

Disclosure of Williams's conclusions regarding water flow in the direction of Cadiz's land after the CPC's decision to approve the EIR did not require

EIR revision and recirculation. The change in water flow was considered and addressed in the EIR. Although the EIR concludes the groundwater flow was currently flowing south and/or in a southwesterly direction, away from Cadiz's land, there is ample discussion in the EIR of factors impacting the direction of the flow, and recognition that it could change with a change in water pumping.

The Mitigation, Monitoring and Compliance Program addresses such possible change in water flow as follows: "An outpost ground water monitoring well shall be installed easterly of the landfill to detect leachate contamination of the underlying ground water and potential offsite migration in the event of a release from the leachate containment system. . . . Additional monitoring wells shall be installed on the easterly downgradient area at intervals and specific locations to be determined by the County Geologist if and when the natural ground water gradient is altered causing a reversal of natural flow in an easterly direction."

▮▮▮ Disagreement among experts does not constitute grounds for overturning an EIR. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 408.) And under CEQA Guidelines section 15126.2, "In assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area as they exist at the time the notice of preparation is published."

The County was not required to revise and recirculate the EIR based on Williams's conclusion that Cadiz's future expansion of its agricultural operations would change the water flow due to increased water pumping.

C. *Adequacy of Description of Geologic Setting*

Cadiz contends the EIR's discussion of the landfill's geologic conditions is inadequate as to (1) fissures, (2) lineament A, (3) potential on-site faults, and (4) the off-site South Bristol Mountains Fault. Cadiz claims these geologic conditions are significant because they may lead to rupture of the landfill liners, which in turn may lead to groundwater contamination.

1. *Fissures*

Cadiz asserts that the DEIR completely ignored fissure systems located in close proximity to the landfill site, and although the FEIR mentions them in

appendix D,[22] their significance is not discussed in any document circulated for public review.

According to a report cited in the DEIR and SEIR, entitled "Phase II, Geologic, Hydrogeologic and Geotechnical Site Characterization Study, Bolo Station Facilities," by Jacobs Engineering Group Inc., the presence of fissuring "may be the surface expression of a fault." The DEIR states that "Based on the studies conducted to date (e.g., aerial photo reviews, records and literature search, site reconnaissance, geologic mapping), no active or potentially active faults are known to be within or trending towards the Bolo Station site, and therefore, no impact is expected. . . ." The DEIR further states that to ensure against undetected seismic activity at the site, a supplemental site verification study involving geophysical surveys and geologic mapping will be required, and will include a fracture trace analysis from aerial photographs of the region. The DEIR concludes that the largest potential source of earthquake activity is the Ludlow Fault 15 miles away, and the landfill is designed to withstand seismic activity from this fault.

The SEIR also discusses faulting and seismicity in the area, noting that the Mojave Desert is characterized by a series of "northwest trending, right lateral, strike-slip faults," concentrated primarily "in the central to southwest portion of the Mojave Desert and become more diffuse and poorly defined in the eastern portions of the desert" where the landfill is located, and that "Additional research and field exploration conducted to evaluate the potential presence of Holocene faulting and buried gravel channels did not yield any evidence to suggest the presence of these features."

Based on two geologic reports, the SEIR concludes there is no evidence of site faulting or surficial evidence of faults in the area. The two reports were prepared for Rail by Jacobs Engineering Group Inc., and are entitled "Phase I, Geologic, Hydrogeologic and Geotechnical Site Characterization Study, Bolo Station Facilities" (Phase I report), dated October 1990, and "Phase II, Geologic, Hydrogeologic and Geotechnical Site Characterization Study, Bolo Station Facilities," dated December 1991 (Phase II report). The reports are referenced in the DEIR and SEIR as background reports relied upon in the DEIR and SEIR, and were made available for review upon request.

The Phase II report states: "Lineaments and fissures in the vicinity of the project site were identified as a part of the site geology interpretation and seismic hazard analysis. . . . Fissures are surface fractures that can be

[22]Appendix D to the EIR contains a report, dated March 31, 1994, entitled "Analysis of Geologic Issues Related to Seismic Risk on the Proposed Rail-Cycle Bolo Station Landfill Near Amboy," by Gary S. Rasmussen & Associates, Inc.

observed in the field. Lineaments and fissures are investigated because of the possibility that they may be the surface expression of a fault. [¶] With one exception, no lineaments or fissures were identified within the proposed site by this investigation. The fissure that extends into the project area is not considered significant (see southeast corner of Plate 4-1 [regional geologic map]). The characteristics and occurrence of the observed ground fissures and lineaments in the site vicinity are described in the following sections." Various fissures were further discussed in the report.

After circulation of the SEIR, an additional study was provided, which was attached as appendix D to the FEIR. It is entitled "Analysis of Geologic Issues Related to Seismic Risk on the Proposed Rail-Cycle Bolo Station Landfill Near Amboy," is dated March 31, 1994, and is by Gary S. Rasmussen & Associates, Inc., a Rail consultant. The report states that its purpose is to provide an independent review of seismic risks associated with the landfill by analyzing the geologic issues, data, and conclusions contained in the DEIR, SEIR, and related reports. The report mentions fissures in the area and notes the possibility of future propagation of fissures in the area. The report concludes that the DEIR/SEIR "seismic analysis, including ground shaking and ground rupture of the site as described in the Draft EIR and Supplement to the Draft EIR, together with information described in this report, are considered to adequately describe the seismic risk to the site." The report suggests that to mitigate the risk of undetected seismic impact on the landfill, additional surveying of the landfill during excavation of the cells could be done, and if active faulting is found at that time, setbacks of the cells 200 feet from any such faults could be implemented without adversely affecting the landfill.

Also provided in response to the SEIR, is a report dated February 1994, prepared by Roy Shlemon for Cargill Salt Co., stating that there are surface ground fissures near the southwest and southeast corners of the proposed landfill. The report notes that fissures may have been caused by settlement or ground subsidence from hydrocollapse (groundwater withdrawal) or seismic activity. The report is critical of the investigative trenching conducted in connection with the landfill project. It states: "It thus seems evident that the four, each less than 100-ft long, trenches emplaced across geophysical anomalies inherently did not expose the 'numerous other GPR anomalies,' some of which may well be subsurface fissures. Only deep, extensive and well documented trenching will resolve the potential subsurface fissure issue, investigations that have yet to take place. [¶] Regardless of their origin, many subsurface fissures may enlarge and ultimately become preferred pathways for possible contaminant flow."

■ We conclude the EIR contains ample discussion and analysis of seismic activity, including faulting and fissures. Extensive geologic studies,

mapping, and reports were provided. While some of the aerial photographs may not have been provided prior to certification of the EIR, this is not fatal to the EIR since the EIR adequately addresses the presence of fissures through other mapping, studies, investigation, and reports.

2. *Lineament A*

Lineament A is a visible 6,000-foot line of raised land, running north toward the landfill. The northernmost end is located approximately one mile south of the southwestern corner of the landfill. The FEIR concludes that "the follow-up investigations verify the findings and conclusions of the Draft EIR/EIS that there are no active or inactive faults within the vicinity of the proposed site or that tend towards the site." Cadiz claims that lineament A may be an active fault and was not properly trenched to determine whether it is an active fault.

CEQA Guidelines section 15144 states that, "While foreseeing the unforseeable is not possible, an agency must use its best efforts to find out and disclose all that it reasonably can." "Without accurate and complete information pertaining to the setting of the project and surrounding uses, it cannot be found that the FEIR adequately investigated and discussed the environmental impacts of the development project." (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* 27 Cal.App.4th at p. 729.) But "the lead agency is not required to conduct all suggested testing or experimentation." (*Id.* at p. 728.)

The DEIR identified lineament A as a possible fault trace requiring further investigation. The Phase II report by Jacobs Engineering Group Inc., referenced in the DEIR, states: "It is not clear at this stage whether lineament A is the result of groundwater withdrawal, a sedimentary contact, or a fault in underlying bedrock. [¶] Unequivocal interpretation of lineament A cannot be provided with current data. Lineament A, if found to be an active fault, could create two geologic hazards: displacement along the fault trace and ground shaking caused by earthquake. Therefore, exploratory trenching in at least two locations along lineament A . . . is recommended."

Following circulation of the DEIR, additional geologic testing, investigation, and trenching was performed by Jacobs Engineering Group Inc. and by geology expert Thomas Rockwell, Ph.D., to evaluate further lineament A. Agency representatives from the California Regional Water Quality Control Board, State Water Resources Control Board, and the County were present during the reconnaissance of lineament A. A trenching program was developed by Rail and various governmental agencies. In order to determine

whether lineament A extended onto the landfill site, lineament A was trenched on the landfill site, directly beyond the northern end of the visible portion of the lineament. Jacobs Engineering excavated and logged four trenches, each about 60 to 100 feet long. The trenching indicated that lineament A did not extend onto the landfill site.

Three geologists provided expert opinion that lineament A was not fault-related. (Rockwell, Jacobs Engineering Group Inc., and Gary Rasmussen.) Rasmussen further concluded that even if it were a fault, lineament A was not large enough to produce an earthquake in excess of 4.0, and the landfill was engineered to withstand even greater seismic activity since it was designed to withstand seismic activity from the Ludlow fault, which although farther away could cause a much stronger earthquake.

Rasmussen stated in his report that, if lineament A is a fault, the only real concern is whether it extends onto the landfill site. If it does, it could cause actual ground displacement, movement of the landfill structure, and rupture of the lining. This is why state law requires a landfill to be set back a minimum of 200 feet from a fault line.

Recognizing that the on-site trenching was not definitive, the County included in the FEIR a mitigation measure (Mitigation Measure G-8), which provides that during excavation for the landfill cells, subsurface geologic investigation shall be performed to determine whether there are any on-site faults under the landfill, and if a fault is discovered, no landfill cell shall be built within 200 feet of the fault location. This mitigation measure was recommended by the State Water Resources Board, as well as Rasmussen.

Cadiz claims lineament A was trenched in the wrong area. According to Cadiz, and several experts, lineament A itself should have been trenched, rather than trenching north of lineament A. We conclude there was substantial evidence in the record supporting the County's conclusion that further trenching was not necessary. There was ample evidence that lineament A was not an active fault and that it did not extend onto the landfill site. The location of the trenches was determined based upon expert opinion. According to expert opinion, the only real concern was whether, if lineament A was a fault, it extended onto the landfill site. Trenching indicated it did not, and therefore it was concluded that further trenching of lineament A off-site was not necessary. Furthermore, Mitigation Measure G-8 required additional geologic investigation performed at the time of the excavation of each landfill cell to confirm the absence of faults on the site.

While there may be conflicting opinion as to the need for additional trenching, this is not fatal to the EIR. "[T]he fact that there are differing

opinions arising from the same pool of information is not grounds for holding the EIR inadequate. . . . [¶] . . . '[I]t is not required "that the body acting on an EIR correctly solve a dispute among experts." All that is required is that in substance the material in the EIR be responsive to the opposition, particularly where opinion and not fact is in issue. [Citation.]' " (*Greenebaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391, 413 [200 Cal.Rptr. 237].) "A court's task is not to weigh conflicting evidence and determine who has the better argument . . . . We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so." (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 393.)

In addition, the County was not required to exhaust all suggested testing before EIR certification (*San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus, supra,* 27 Cal.App.4th at p. 728), particularly since there was expert opinion indicating that further investigation was not necessary. "Just as an agency has the discretion for good reason to approve a project which will admittedly have an adverse environmental impact, it has discretion to reject a proposal for additional testing or experimentation." (*Society for California Archaeology v. County of Butte* (1977) 65 Cal.App.3d 832, 838-839 [135 Cal.Rptr. 679].)

We conclude that there is substantial evidence supporting the finding that lineament A was adequately investigated and discussed in the EIR, and the County's decision not to require additional trenching before certifying the EIR does not constitute an abuse of discretion.

### 3. *Potential Faults Under the Landfill Site*

The FEIR concludes, based on various geologic reports and maps referenced in the FEIR, that the proposed landfill site is not located on any Holocene fault.[23]

After the EIR was certified, discovery conducted by Cadiz revealed that the firm that performed the investigative seismic studies, Rutter and Wilbanks Corp. (R&W), concluded in two May 1992 reports that as many as 27 faults may exist under the landfill site. These two reports were not mentioned in the FEIR.

Cadiz argues that the absence of the reports or any mention of their conclusions renders the EIR's discussion of the landfill project geologic

---

[23]A Holocene fault is a fault that has been active within Holocene time (about the last 11,000 years).

setting inadequate and in violation of CEQA Guidelines section 15151. CEQA Guidelines section 15151 requires the EIR to summarize the main points of disagreement among experts as to the potential existence of faults under the landfill site.

Although R&W's finding that there may be 27 faults under the landfill site is not mentioned in the EIR, this is not fatal to the EIR because there is ample information provided regarding investigation, data, mapping of potential active faults under the landfill, and expert analysis regarding the existence of on-site active faults. R&W's seismic studies were discussed in the FEIR technical background report, entitled "Geophysical Survey Report," prepared for Rail by Jacobs Engineering Group Inc. Jacobs Engineering was not required to adopt R&W's conclusions, nor does Jacobs Engineering's report purport to do so. Jacobs Engineering's report merely states that the seismic surveys considered in Jacobs Engineering's review were provided by R&W. While R&W's report may have provided an additional analysis of the geologic data presented, there were ample reports by other experts referenced in the EIR, including reports containing views contrary to, and critical of, Jacobs Engineering's conclusions.

We conclude the EIR's discussion of potential faults on the landfill project site is adequate and nondisclosure of R&W's seismic survey conclusions is not fatal to the EIR.

### 4. *The South Bristol Mountains Fault*

Cadiz complains that the EIR erroneously and deceptively states that the nearest potentially active fault is 15 miles northwest of the landfill (the Ludlow fault), whereas the South Bristol Mountains Fault (Bristol fault) is four miles from the landfill site and should be referred to as a "potentially active" fault, as classified by the California Division of Mines and Geology (CDMG).

A CDMG 1994 report, entitled "An Explanatory Text to Accompany the Fault Activity Map of California and Adjacent Areas," classifies the Bristol fault as a "quaternary fault," and explains: "The terms 'active,' 'potentially active,' 'capable,' and 'inactive,' have been interpreted differently by geologists, seismologists, and agencies, depending on the purpose on hand. To avoid confusion, this Fault Activity Map does not use these terms. Instead, faults are classified according to the age of latest displacement and, hence, are as factual as the geologic data upon which the fault is based." The report then states the various definitions of the terms "active," "potentially active," "capable," and "inactive." One definition of a potentially active fault is "any

fault that showed evidence of surface displacement during Quaternary time" (the last 1,600,000 years).

According to William A. Bryant, head of the Alquist-Priolo Earthquake Fault Zoning program of the CDMG, " '*faults having no evidence for surface displacement within Holocene time* [within the last 11,000 years] *are necessarily inactive. . . .* 'Potentially active faults,' defined strictly for purposes of the Alquist-Priolo Act, are those faults having evidence of surface displacement during Quaternary time (last 1.6 million years).' (emphasis added)."

In a memorandum dated June 8, 1995, to the Board, regarding the landfill EIR, County geologist Wes Reeder defined an active fault as "one that has had surface rupture within Holocene time (within the last 11,000 years)," and an inactive fault as one which "has not moved during the Holocene. A *potentially active* fault is a fault with unknown Holocene activity. If it can be shown that a fault has not moved within the last 11,000 years (Holocene time), the fault is no longer considered potentially active, but inactive." Reeder concludes in his memorandum that since there has been no seismic activity within the past 11,000 years, the Bristol fault is accurately classified in the EIR as an inactive fault.

Reeder further noted that "There has been much discussion and confusion with respect to fault activity as defined by the State Division of Mines and Geology (DMG)." Reeder stated that he discussed the matter with another expert who "concurs with the County's interpretation of fault activity definitions and indicates that it is in conformance with the intent of the Alquist-Priolo Earthquake Fault Zoning Act."

There is substantial evidence in the record supporting the County's classification of the Bristol fault as inactive and there is ample discussion of the differing views and definitions of fault classifications and terms. The County geologist considered and rejected Cadiz's contention that the EIR erroneously classified the Bristol fault as inactive.

While there may be conflicting opinion as to whether the Bristol fault should be referred to as an inactive or potentially active fault, such dispute is not fatal to the EIR. The fact that there are differing expert opinions is not grounds for holding the EIR inadequate. All that is required is that the EIR be responsive to opposing viewpoints. (*Greenebaum v. City of Los Angeles, supra,* 153 Cal.App.3d at p. 413; *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 392.) We find no reversible error or deception in the EIR indicating that there is no active fault within 15 miles of the landfill site.

Cadiz further complains that, since the EIR did not rule out the possibility of seismic activity on the Bristol fault, the EIR should have considered the potential effects of such seismic activity on the landfill. Cadiz's contention is without merit since the EIR concludes the fault is inactive. CEQA Guidelines section 15145 states that, "If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact."

There is substantial evidence supporting a finding that there was a thorough investigation of the Bristol fault and that future seismic activity was too speculative for evaluation beyond that contained in the EIR. We thus conclude that there was no error in the EIR's not considering the potential effects of Bristol fault seismic activity on the landfill beyond that which was considered and discussed in the EIR.

### D. *Air Quality Impacts*

Cadiz contends the EIR does not adequately identify and analyze air quality impacts, such as the impact of ozone and locomotive emissions on Cadiz's crops. The EIR acknowledges that the landfill will cause substantial additional emissions of oxides of nitrogen (NOx) and reactive organic gases (ROG) (ozone precursors[24]), and will result in unavoidable worsening of ozone levels in the Southeast Desert Air Basin. The EIR nevertheless concludes this will not significantly impact Cadiz's agriculture.

### 1. *Emissions from Landfill Operations*

Cadiz argues that studies, as well as the County's general plan, recognize that excessive ozone levels cause crop damage, and Cadiz's Thompson Seedless Grapes crop is particularly sensitive to ozone. Cadiz claims there is no discussion of this impact in the EIR.

In the potential environmental impacts section of the DEIR, the DEIR states: "Air quality impacts may occur on a local scale as a result of air pollutant emissions from the proposed action. These impacts would result from the various emission sources associated with the landfill, including fugitive landfill gas, landfill flare, locomotives while at the site, and heavy-duty construction equipment. . . . The local study area (see Figure 1.2) encompasses the landfill facility and the surrounding area within a radius of approximately 10 kilometers. This area encompasses . . . Pacific Agriculture near Cadiz."

---

[24]The DEIR defines precursor pollutants as "emissions that undergo chemical reactions in the atmosphere to form other pollutants. The most important of these are NOx and ROG, the primary reactants that form O3 [ozone]."

The DEIR notes that the "primary regional impact of concern is that of the photochemical pollutant ozone," and that "[t]he proposed action will result in substantial additional emissions with SEDAB [Southeast Desert Air Basin] of the two primary O3 [ozone] precursors: NOx and ROG. It is reasonable to expect that the frequency and magnitude of exceedances of the O3 standard in the project area will increase as a result of these emissions. . . . [T]he proposed action results in an approximate 4 percent increase in combined NOx and ROG emission in the SEDAB." The DEIR acknowledges in the summary of potential environmental consequences, that the landfill effects on air quality related to the production of NOx and ROG emissions could not be reduced below a level of significance.

The DEIR further states as regards agriculture: "The land in the general area of the proposed action supports sparse vegetation. [Cadiz's] farm near [the town of] Cadiz represents the only sensitive vegetation receptor. Criteria pollutant modeling data . . . indicate that the incremental criteria pollutant impacts associated with the proposed action upon Pacific Agriculture are well below the primary and secondary NAAQS [National Ambient Air Quality Standards], which have been promulgated with an adequate margin of safety, to protect public health and welfare from known or anticipated adverse effects of a pollutant. In addition, the results of the multipathway health risk assessment summarized in Section 5.7.1.2.2 consider potential health risks associated with toxic air pollutant impacts upon crop ingestion. These analyses demonstrated that, even at the maximum impact location, the proposed action is not likely to result in unacceptable health risks." The DEIR thus concludes that "the proposed action is not expected to result in a significant impact upon sensitive vegetation."

The EIR adequately identifies and discusses the impact of NOx and ROG emissions on Cadiz's agriculture. While Cadiz may disagree with the EIR's conclusion that these pollutants are not expected to result in a significant impact upon Cadiz's agriculture, substantial evidence supports the conclusion and thus Cadiz's difference in opinion does not render the EIR inadequate. (*Greenebaum v. City of Los Angeles, supra,* 153 Cal.App.3d at p. 413; *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 392.)

2. *Emissions from Locomotives*

Cadiz complains that the EIR understates the estimated amount of ozone-producing nitrogen oxide emissions from locomotives. The EIR's estimates are based on the assumption that the California Air Resources Board (CARB) will adopt new locomotive emissions regulations. As a consequence, air emissions estimates were adjusted downwards. Although in

1991, CARB proposed to adopt new locomotive emissions regulations, CARB later withdrew its proposed regulatory plan and has not adopted new regulations.

Rail argues that under Public Resources Code section 21177, subdivision (a), Cadiz is precluded from arguing this on appeal because Cadiz failed to object during the EIR process that the EIR's calculation of locomotive emissions was improperly based on proposed but not enacted CARB regulations.

Public Resources Code section 21177, subdivision (a) provides that "No action or proceeding may be brought pursuant to Section 21167 unless the alleged grounds for noncompliance with this division were presented to the public agency orally or in writing by any person during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination."

According to the administrative record, Cadiz raised this matter during the administrative proceedings in a report entitled "Response to Presentation by Rail-Cycle Proponents to San Bernardino County Planning Commission," dated October 28, 1994, submitted shortly before the CPC decided to recommend approval of the EIR. Cadiz also raised the issue by letter, dated February 23, 1995, to the Board, in support of Cadiz's appeal of the CPC's decision to recommend approval of the EIR. Hence, Cadiz did not waive the issue on appeal.

Although it was not improper to include in the EIR projections based on anticipated revisions to the applicable regulations, estimates based on current regulations were also required since the anticipated revised regulations had not yet been enacted. When addressing significant environmental impacts, according to CEQA Guidelines section 15126.2, subdivision (a), "An EIR shall identify and focus on the significant environmental effects of the proposed project. In assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area as they exist at the time the notice of preparation is published . . . ."

Also, under CEQA Guidelines section 15144, "an agency must use its best efforts to find out and disclose all that it reasonably can." The CEQA Guidelines section 15144 discussion comment states that "This section limits the requirement for forecasting to that which could be reasonably expected under the circumstances and is part of the effort to provide a general 'rule of reason' for EIR contents. [¶] In regard to forecasting, the *Laurel Heights*

Court commented that an agency is required to forecast only to the extent that an activity could be reasonably expected under the circumstances. An agency cannot be expected to predict the future course of governmental regulation or exactly what information scientific advances may ultimately reveal. *Laurel Heights Improvement Association v. Regents of the University of California*[, *supra*,] 47 Cal.3d 376.)"

Here, DEIR emissions tables state the estimated maximum daily and annual landfill operations emissions from on-site and off-site locomotives, and locomotive idling. The tables include estimated NOx and ROG emissions. The DEIR also discusses the data contained in the tables, and acknowledges that "[T]he proposed action results in an approximate 4 percent increase in combined NOx and ROG emission in the SEDAB [Southeast Desert Air Basin]."

The SEIR adds that "Emissions associated with Rail-Cycle trains were based on data presented in the Draft EIR/EIS, and on current CARB plans to achieve emission reductions from locomotives in nonattainment air basins (CARB, 1992). For 1994, no emission reductions are projected. By 1998, the following emission reductions are projected: [¶]—NOx: 40 percent; [¶]—PM10: 10 percent; [¶]—Sulfur oxide (SOx): 84 percent; [¶]—ROG: 0 percent."

The SEIR notes that "A review of the baseline emissions (i.e., those reported in the Draft EIR/EIS) was conducted and revisions made to several areas where updated information is available that makes a significant change in the estimated project emissions. Baseline emissions associated with the project are estimated to be substantially lower than those reported in the Draft EIR/EIS. The reductions in emissions are primarily the result of NOx emission controls on locomotives, as forecast by CARB."

In addition, locomotive emissions data is contained in various background technical reports, including the "Addendum to: Air Quality Site Characterization Study," dated October 1991, prepared by Jacobs Engineering Group Inc., for Rail; the "Air Quality Impact Analysis" report, dated February 1992, prepared by Jacobs Engineering Group Inc., for Rail; and "Supplemental Air Quality Analysis" report, dated May 1993, prepared by Rail.

The May 1993 supplemental air quality analysis report states in response to DEIR comments, that the County Air Pollution Control District (APCD) questioned whether the DEIR adequately addressed air quality mitigation measures and concluded that further measures should be added to the EIR. In response, Rail conducted additional analysis of air quality emissions and

mitigation measures, and stated its findings and conclusions in the May 1993 Supplemental Air Quality Analysis report. The report notes that "Baseline emissions associated with the project are projected to be substantially lower than those reported in the DEIR/DEIS. The reductions in emissions are primarily the result of NOx emission controls on locomotives, as forecast by the California Air Resources Board."

This indicates that the DEIR and supporting background technical reports disclosed emissions data and projections based on existing regulations, and the SEIR and May 1993 Supplemental Air Quality Analysis report provided calculations and projections based on the anticipated revised regulations.

We conclude the EIR's discussion of estimated locomotive emissions is not in violation of CEQA. The EIR, which includes both the DEIR and SEIR, includes locomotive emissions projections and data based on both the existing and anticipated revised regulations.

E. *Potential Cumulative Impacts on Air Quality and Groundwater*

Cadiz contends the EIR fails to quantify the project's cumulative impacts on air quality and groundwater, as is required under CEQA Guidelines section 15130, subdivision (b)(2).

The term "cumulative impacts" is defined in CEQA Guidelines section 15355 as "two or more individual effects which, when considered together, are considerable or . . . compound or increase other environmental impacts."[25] A cumulative impact is also defined as "an impact which is created as a result of the combination of the project evaluated in the EIR together with other projects causing related impacts." (CEQA Guidelines, § 15130, subd. (a)(1).)

 "The Guidelines require that an adequate cumulative impacts analysis include a list of the projects producing related or cumulative impacts, a summary of the expected environmental impacts from those projects and a reasonable analysis of the cumulative impacts of the relevant projects. (Guidelines, § 15130.)" (*Kings County Farm Bureau v. City of Hanford, supra,* 221 Cal.App.3d at p. 729.)

---

[25]Guideline 15355 states: " 'Cumulative impacts' refer to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts. [¶] (a) The individual effects may be changes resulting from a single project or a number of separate projects. [¶] (b) The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonably foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time."

 CEQA Guidelines section 15130, subdivision (b)(2) states: "(b) The discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided for the effects attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness, and should focus on the cumulative impact to which the identified other projects contribute rather than the attributes of other projects which do not contribute to the cumulative impact. The following elements are necessary to an adequate discussion of significant cumulative impacts: [¶] . . . [¶] (2) A summary of the expected environmental effects to be produced by those projects with specific reference to additional information stating where that information is available . . . ."

The EIR adequately discusses the project's cumulative impacts. Various projects are listed and briefly discussed. Table 6.1 in the DEIR, SEIR, and FEIR indicates whether each project will have a potential cumulative impact on air, water, and other environmental elements. The DEIR also contains a generalized discussion of air quality cumulative impacts, and makes reference to a more detailed discussion of air quality impacts in another section of the DEIR. The EIR (which includes the DEIR and SEIR), in conjunction with the background technical reports, contains detailed information regarding the current and projected quantity of toxic air emissions in the area.

While the discussion of groundwater cumulative impacts is also generally adequate, it may need to be revised since, as already discussed, the EIR fails to discuss the volume of water in the aquifer. We also note that at the time of revision of the EIR regarding groundwater volume, a more detailed discussion of the Mojave Water/Cadiz water project may be required.

## IV. *Conditional Use Permit and General Plan Amendment*

Cadiz contends the County's decision to approve a CUP and general plan amendments for the landfill constitutes an abuse of discretion.

Rail requested amendments to the general plan and a CUP, along with EIR certification, for purposes of developing the proposed landfill. Despite Cadiz's objections, the CPC recommended adoption of the proposed amendments, approval of the CUP, and certification of the EIR. Cadiz appealed without success to the Board, thereby exhausting its administrative remedies.

We realize this issue is moot due to this court reversing the trial court ruling denying Cadiz's writ petition, which will result in vacating EIR certification and CUP approval. Nevertheless we address Cadiz's contention

challenging the CUP since, if we do not, the issue may be raised in a future appeal, after revision and recertification of the EIR.

## A. *Standard of Review*

The County's decision to grant a CUP is an administrative or quasi-judicial act (*Goat Hill Tavern v. City of Costa Mesa* (1992) 6 Cal.App.4th 1519, 1525 [8 Cal.Rptr.2d 385]). Judicial review must be in accordance with Code of Civil Procedure section 1094.5[26] (*Goat Hill, supra,* at p. 1525), which requires the court to consider "whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (Code Civ. Proc., § 1094.5, subd. (b); *Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d 506, 514-515.) "If an administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence and find an abuse of discretion if the findings are not supported by the weight of the evidence. [Citations.] On appeal, we consider only whether the trial court's finding is supported by substantial evidence. [Citations.] If the decision does not substantially affect a fundamental vested right, the trial court considers only whether the findings are supported by substantial evidence in the light of the whole record." (*Goat Hill, supra,* at pp. 1525-1526.)

Cadiz argues that, at the trial court level, the independent judgment standard of review applied, whereas Rail argues that the substantial evidence test applies to trial court review.

The determination of whether granting a CUP substantially affects a fundamental vested right is made on a case-by-case basis. (*Goat Hill Tavern v. City of Costa Mesa, supra,* 6 Cal.App.4th at p. 1526.) " 'In deciding whether a right is "fundamental" and "vested," the issue in each case is whether the " 'affected right is deemed to be of sufficient significance to preclude its extinction or abridgment by a body lacking *judicial* power.' [Citation.]" ' [Citation.] [¶] The courts have rarely upheld the application of the independent judgment test to land use decisions." (*Id.,* at pp. 1526-1527.) The test typically applies to classic vested rights, such as the right to continued operation of one's business. (*Id.* at p. 1529.)

---

[26]Code of Civil Procedure section 1094.5 is "the state's administrative mandamus provision which structures the procedure for judicial review of adjudicatory decisions rendered by administrative agencies." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].)

In *Gallegos v. State Bd. of Forestry* (1978) 76 Cal.App.3d 945 [142 Cal.Rptr. 86], the Camp Meeker Improvement Association and several individuals asserted on appeal that they had a fundamental vested right in a lumber company not obtaining a timber harvesting license because the proposed logging operation posed an increased fire danger in the area and could cause irreparable harm to the water supply upon which appellants relied. The *Gallegos* court concluded that, although a fundamental right was involved, neither appellants nor the public had a present possessory, or vested right in the subject timberlands, and thus "It was not error for the trial court to apply the substantial evidence test in reviewing the factual findings of the board." (*Gallegos, supra,* at p. 950.)

Here, too, Cadiz does not have a present possessory, or vested right in the landfill project or site, which is the subject of the CUP and, hence, the substantial evidence test was the appropriate standard of review at the trial court level. We in turn must review the trial court's ruling denying Cadiz's writ petition based on whether the trial court's finding is supported by substantial evidence. (*Goat Hill Tavern v. City of Costa Mesa, supra,* 6 Cal.App.4th at p. 1525; *E.W.A.P., Inc. v. City of Los Angeles* (1997) 56 Cal.App.4th 310, 325 [65 Cal.Rptr.2d 325].)

B. *Sufficiency of Evidence Supporting CUP and Amendments*

Cadiz argues that the County's decision to grant the CUP and approve general plan amendments must be set aside because the landfill is inconsistent with the County's general plan. The County approved a general plan text amendment and infrastructure/improvement overlay map change which allow a class III solid waste landfill facility on the proposed landfill site. The County also approved an amendment permitting a land use district change from "undesignated" to "resource conservation" for the exchanged BLM lands, and approved a CUP to establish a waste-by-rail class III municipal solid waste landfill.

Government Code section 65300 provides that "Each planning agency shall prepare and the legislative body of each county and city shall adopt a comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning."

As explained in the County general plan, "Any amendment to the Plan text or maps must be reviewed by the Planning Commission and be adopted by the Board of Supervisors." Any proposed amendment to the land use maps must be consistent with the criteria and conditions of the general plan text.

Also, pursuant to San Bernardino County Development Code section 83.030120, subdivision (d)(4), in order to approve a CUP the County must find that the "proposed use is consistent with the goals, policies, standards and maps of the General Plan and any applicable plan." Cadiz claims the County's finding that the landfill was consistent with the general plan was not supported by substantial evidence.

The general plan notes that " 'The Land Use Element is the primary policy base for guiding the physical development of the privately owned unincorporated land in the County. The Land Use Element correlates all land uses issues into a set of coherent development policies.' (General Plan, p. II-D6-2.)" The general plan further states that "The County shall provide for a *compatible and harmonious arrangement of land uses* in the rural areas' and shall 'support measures to preserve the soils essential to agriculture and encouraging the protection and preservation of open space for recreation uses.' (General Plan, p. II-D6-4.)"

The proposed landfill action is conditioned upon the transfer to Rail of BLM land, which is part of the proposed landfill site. The BLM land to be transferred to Rail is designated as class L land. Use of class L land for a solid waste management facility is not consistent with the California Desert Conservation Area Plan and thus requires redesignation of the land. The approved amendments to the general plan transfer BLM land to Rail and redesignate the land as "Resource Conservation" land. The remaining landfill site land is already designated Resource Conservation land.

The general plan states that the purpose of designated Resource Conservation land is "[t]o encourage limited rural development that maximizes preservation of open space, watershed and wildlife habitat areas" and "[t]o establish areas where open space and nonagricultural activities are the primary use of the land, but where agriculture and compatible uses may coexist."

Cadiz asserts that building a landfill on Resource Conservation land is inconsistent with the general plan's goals, policies, standards and maps of the County general plan and development code because, as stated in the EIR, the landfill is an " 'intensive, industrial-type use,' " and " 'the visual qualities of the site will be impacted resulting in the proposed action *not being compatible* with the Open Space Element of the County General Plan.' " The DEIR summary of impacts, mitigation measures, and unavoidable adverse impacts also stated that "The presence of the landfill will permanently change the visual character of the site, due to the establishment of an artificial mound on the flat desert floor and long-term, industrial activity in

a rural portion of the desert. The illumination of the night sky will also change the visual character of the desert locale."

▪ Although the EIR concludes the landfill is not compatible with the open space element of the general plan because of the landfill's impact on the "visual qualities of the site," the landfill is not necessarily inconsistent with the general plan. As noted in the EIR in its responses to Cadiz's comments regarding the County general plan, "the County General Plan's policies are designed to assure environmentally safe landfill development, which protects natural resources, and would indicate that, with implementation of required protective measures, landfills and agricultural lands are not incompatible uses. Furthermore, the environmental analysis conducted in this EIR/EIS does not identify significant impacts to surrounding land uses, or effects of the proposed landfill which would adversely affect [Cadiz's] agricultural operations."

In addition, the general plan expressly states that landfills are encompassed within the category of open space land uses. The general plan states under the heading, "Open Space for Public Health and Safety," that "Also included in this category of open space are land uses which are required as part of the overall functioning of modern society and which include or require undeveloped land as a resource or a buffer; this includes *landfills* and airports." (Italics added.)

The general plan recognizes the growing need for landfills, while also noting that "Because of its mostly undeveloped expanse, the Desert area is viewed by many as an ideal location for the disposal of solid and hazardous waste materials. In order to conserve the fragile desert environment and accommodate the needs of waste disposal, management practices must take into account the desires of Desert area residents." This can reasonably be construed as stating that, when building a landfill in the desert, an effort should be made to address the concerns of area residents and minimize harmful impacts on the desert environment. We do not view this language as stating that landfills are inconsistent with the general plan.

Cadiz complains that the County failed to provide adequate findings supporting its decision to approve the CUP. Cadiz claims the County's findings merely state that " 'The proposed use is consistent with the goals, policies, standards and maps of the County General Plan, the Development Code and the County Solid Waste Management Plan.' "

▪ An administrative agency is required to "render findings sufficient both to enable the parties to determine whether and on what basis they

should seek review and, in the event of review, to apprise a reviewing court of the basis for the board's action." (*Topanga Assn. for a Scenic Community v. County of Los Angeles, supra,* 11 Cal.3d at p. 514.) Although the Board's findings " 'need not be stated with the formality required in judicial proceedings' [citation], they nevertheless must expose the board's mode of analysis to an extent sufficient to" enable the parties to the agency proceeding to determine whether and on what basis they should seek review, and to apprise the reviewing court of the basis for the board's action. (*Id.* at p. 517, fn. 16.)

The County not only stated the findings quoted by Cadiz, but also provided additional sufficiently detailed findings adequately explaining the reasons for approving the CUP, including the following finding: "The proposed project is consistent with the Open Space policies of the General Plan which recognize that landfills are uses which require undeveloped land and open space as a resource or a buffer."

These findings provide an adequate explanation of the reasons for concluding the landfill is consistent with the general plan. The general plan states that landfills fall within the general plan classification of an appropriate open space land use, and a resource conservation land designation permits the land to be used for open space land uses enumerated in the general plan, including landfills. The general plan also emphasizes the increasing need for additional solid waste facilities, and acknowledges that the desert is a common location for such facilities.

Cadiz argues that the general plan amendments, which add the landfill site to the appropriate general plan overlay map and designate the exchanged BLM land as resource conservation land, render the general plan internally inconsistent, in violation of Government Code section 65300.

Section 65300.5 of the Government Code "requires that the general plan and its elements and parts 'comprise an integrated, internally consistent and compatible statement of *policies* . . . .' It is the *policies* which must be integrated, internally consistent and compatible, not the maps which simply depict policies applied to specific land areas, not the data and statistics, and not even the objectives within the various elements." (*Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 300 [3 Cal.Rptr.2d 504], disapproved on other grounds in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

As explained above, designating the landfill land as resource conservation land and changing the site to a solid waste landfill facility is not inconsistent with the general plan. The general plan expressly allows landfills to be

classified as open space land uses, and the general plan states that a resource conservation designation allows such land to be used for those uses which are considered in the general plan to be appropriate open space uses. The amendments and CUP were not internally inconsistent with the general plan. The trial court thus did not abuse its discretion in approving the general plan amendments and granting the CUP, other than to the extent the underlying EIR was inadequate, as discussed above.

## V. *Denial of Discovery*

Cadiz contends the trial court committed reversible error by denying Cadiz's discovery motions to compel Joseph Lauricella's deposition and production of documents, and by granting the County and Rail's motion to quash various depositions and for a protective order.

Cadiz claims it was entitled to the discovery in question because its purpose was (1) to reveal that the Board's approval of the EIR was illicitly influenced by Rail, (2) to obtain material evidence that was improperly suppressed by Rail, and (3) to establish that the evidence Rail presented in support of the EIR was misleading or false.

Cadiz complains that Joseph Lauricella,[27] also known as Tony Bergschneider, falsely held himself out as a local community leader and resident, and testified before the Board in support of the landfill on May 16, 1995. Cadiz later discovered that he was a convicted felon and a paid Rail consultant, who allegedly was engaged in illicit activities designed for the "planned destruction" of Cadiz. Cadiz claims the County Planning Department director, Valery Pilmer; County Planning Department employee, Philip Smith; and another high-ranking County official knew of Lauricella's illicit activities.

Lauricella, Smith and Rail were indicted on October 1, 1998, for conspiring to destroy Cadiz by conspiring to wiretap, receive and conceal stolen property, manipulate computer data, misuse trade secrets, and commit fraud in connection with sale of stock resulting in devaluation of Cadiz's stock. According to the indictment, Smith allegedly provided confidential County information regarding Cadiz to Rail at Rail's request. Lauricella pled "no contest" to the indictment charges and was sentenced to six years in state prison.

On February 10, 1997, the trial court heard and denied Cadiz's motions to compel Lauricella's deposition and compel Rail to produce documents, without prejudice to renewing the motions at a later date.

---

[27]Throughout these proceedings and in various documents, Joseph Lauricella's name is spelled "Lauricello," as well as "Lauricella."

On February 14, 1997, the County defendants filed a motion to quash Cadiz's deposition notices served on two community activists and several experts who provided testimony and/or reports during the administrative proceedings. The County and Rail argued in their motion to quash that the requested discovery was not proper because it sought discovery into matters beyond the administrative record under *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268].

During oral argument on February 27, 1997, on the County and Rail's motion to quash, Cadiz argued that the discovery was proper because it was sought to find out why certain evidence, such as the R&W report identifying 11 faults, was not included as part of the administrative record. Cadiz also wanted to find out why lineament A was not trenched, and wanted to depose CPC member, Dombrowski, regarding his improper ex parte contacts. Cadiz argued that quashing its discovery would deny Cadiz the opportunity to find out if any of the *Western States* exceptions applied.

The trial court concluded that the purpose of Cadiz's proposed discovery was to show that not all relevant evidence had been considered during the EIR proceedings and that the evidence considered did not support the Board's decision. The court thus granted the County and Rail's motion to quash Cadiz's discovery on the ground Cadiz had not made a sufficient showing that an exception under *Western States* applied.

### A. Discovery Standard of Review

 "Discovery statutes vest a wide discretion in the trial court, and exercise of that discretion will be disturbed only when it can be said there has been an abuse of discretion. An order compelling discovery must rest on a showing that the discovery is reasonably calculated to lead to admissible evidence . . . ." (*Morgan v. Community Redevelopment Agency* (1991) 231 Cal.App.3d 243, 259 [284 Cal.Rptr. 745].)

The standard of review of trial court discovery orders is an abuse of discretion. (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881 [94 Cal.Rptr.2d 505]; *Kleitman v. Superior Court* (1999) 74 Cal.App.4th 324, 330 [87 Cal.Rptr.2d 813].) "Abuse of discretion is a deferential standard of review. [Citation.] Under this standard, a trial court's ruling 'will be sustained on review unless it falls outside the bounds of reason.' (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1226 [9 Cal.Rptr.2d 628, 831 P.2d 1210].)" (*Avant!, supra,* at p. 881; *Kleitman, supra,* at p. 330.)

### B. Exclusion of Evidence Outside the Administrative Record

 If the conflicting evidence is not in the administrative record, the project opponent seeking admission of the evidence in the trial court faces

two hurdles. First, "normally the doctrine of exhaustion of administrative remedies will bar a project opponent from arguing that the EIR improperly omitted such evidence. (See § 21177; see generally, 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act [(Cont.Ed.Bar 1993)] § 23.94, pp. 1001-1004.) [¶] Second, . . . evidence outside the administrative record generally is inadmissible to show that the agency has not proceeded in the manner required by law. (*Western States Petroleum Assn.* v. *Superior Court*[, *supra*,] 9 Cal.4th 559, 565, 574-576 . . .].) However, extra-record evidence is admissible if the proponent shows that the evidence existed before the agency made its decision, but that it was impossible in the exercise of reasonable diligence to present it to the agency before the decision was made. (*Id.,* at p. 578.) Also, arguably, *extra-record evidence may be admissible to show 'agency misconduct.'* (*Id.,* at pp. 575-576, fn. 5.) Thus, if a project opponent argues that the agency failed to proceed in the manner required by law because the EIR failed to disclose information that is not in the administrative record, it must first overcome the general rule that such information is inadmissible by showing that one of these exceptions applies." (*Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1621 [45 Cal.Rptr.2d 688], italics added.)[28]

Code of Civil Procedure section 1094.5, subdivision (e) "accords the court in an administrative mandamus proceeding discretion to remand the case for reconsideration if the court finds 'there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced' at the administrative hearing (or which was improperly excluded therefrom)."[29] (*Fort Mojave Indian Tribe v. Department of Health Services* (1995) 38 Cal.App.4th 1574, 1591 [45 Cal.Rptr.2d 822].)

Rail relies on *Western States* in arguing that Cadiz's discovery sought inadmissible evidence. In *Western States*, a CEQA case, the court considered whether a court may consider evidence outside the administrative record in

---

[28]In *Barthelemy* we relied on *Western States* in concluding agency misconduct might constitute an exception. We note here that *Western States* did not state that agency misconduct is a recognized exception. Rather, the court indicated that it was suggested as an exception in 2 Kostka and Zischke, Practice Under the California Environmental Quality Act, *supra*, section 23.55, pages 967-968, but the *Western States* court did not need to consider the exception. (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 575, fn. 5.)

[29]Code of Civil Procedure section 1094.5, subdivision (e) states that, "Where the court finds that there is relevant evidence that, in the exercise of reasonable diligence, *could not have been produced* or that *was improperly excluded* at the hearing before respondent, it may enter judgment as provided in subdivision (f) remanding the case to be reconsidered in the light of that evidence; or, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, the court may admit the evidence at the hearing on the writ without remanding the case." (Italics added.)

determining whether a quasi-legislative administrative decision was an abuse of discretion under Public Resources Code section 21168.5. The *Western States* court held that "courts generally may not consider evidence not contained in the administrative record when reviewing the substantiality of the evidence supporting a quasi-legislative administrative decision under Public Resources Code section 21168.5." The court also held "that extra-record evidence is generally not admissible to show that an agency 'has not proceeded in a manner required by law' in making a quasi-legislative decision." (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 565.)

The *Western States* court discussed three exceptions to this general rule of nonadmissibility: (1) evidence to show that an administrative agency has not considered "all relevant factors" in making its decision; (2) evidence to show the evidence the agency considered did not support its decision; and (3) evidence that could not be produced at the administrative level "in the exercise of reasonable diligence." (*Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at pp. 576-578.) The *Western States* court concluded that in the first and second instances, the extra-record evidence was inadmissible, but, in the third instance, the evidence was admissible. (*Ibid.*) The court further noted that it did "not foreclose the possibility that extra-record evidence may be admissible in traditional mandamus actions challenging quasi-legislative administrative decisions under unusual circumstances or for very limited purposes not presented in the case now before us." (*Id.* at p. 578.)

Rail argues that *Western States* is inapplicable because, as noted in *Fort Mojave Indian Tribe v. Department of Health Services, supra,* 38 Cal.App.4th at p. 1594, *Western States* applied to traditional mandamus actions whereas the instant action is an administrative mandamus proceeding.

In *Fort Mojave,* which was an administrative mandamus action, the court concluded that the concerns that underlay *Western States*'s holding barring postdecision evidence in quasi-legislative mandamus cases also applied to the application of Code of Civil Procedure section 1094.5, subdivision (e) in administrative mandamus cases. (*Fort Mojave Indian Tribe v. Department of Health Services, supra,* 38 Cal.App.4th at p. 1595.) The *Fort Mojave* court noted that subdivision (e) of Code of Civil Procedure section 1094.5 "opens a narrow, discretionary window for additional evidence, newly discovered after the [administrative] hearing (or improperly excluded at it). . . . [¶] Remand under Code of Civil Procedure section 1094.5, subdivision (e) for consideration of postdecision evidence generally has been limited to truly new evidence, of emergent facts. The leading case [(*Windigo Mills v. Unemployment Ins. Appeals Bd.* (1979) 92 Cal.App.3d 586, 596-597)] endorsing

the use of newly created evidence under the statute adverted to mandamus's traditional function of achieving justice, and then concluded that by the enactment of subdivision (e), '. . . it reasonably may be inferred that [the Legislature] meant to authorize the receipt of evidence of events which took place after the administrative hearing.' [Citation.]" (*Fort Mojave, supra,* at p. 1595.)

The *Fort Mojave* court further explained that the reason for narrowly limiting exceptions to the general rule of excluding evidence outside the administrative record is because routine allowance of conflicting scientific opinions created after an administrative decision would pose a threat of repeated rounds of litigation, and uncertain, attenuated finality. (*Fort Mojave Indian Tribe v. Department of Health Services, supra,* 38 Cal.App.4th at p. 1595; see also *Western States Petroleum Assn. v. Superior Court, supra,* 9 Cal.4th at p. 578.)

While we recognize *Western States* and the instant case differ because *Western States* involved a traditional mandamus quasi-legislative action and the instant case is an administrative mandamus quasi-judicial action, this is a distinction without a difference. (*Fort Mojave Indian Tribe v. Department of Health Services, supra,* 38 Cal.App.4th at pp. 1595-1596; see also Remy, *supra,* pp. 595, 603-604.) Regardless of whether common law principles under *Western States* apply or the action is subject to Code of Civil Procedure section 1094.5, subdivision (e), the underlying principles in determining whether extra-record evidence is admissible are essentially the same. *Western States* and *Fort Mojave* are thus both instructive here in determining whether Cadiz's discovery sought admissible evidence.

C. *Motion to Compel Further Discovery Responses*

Cadiz's motion to compel further discovery responses sought production of documents relating to (1) financial contributions to any former or current elected or appointed governmental official, and/or to election committee(s) or campaign(s) for public office in San Bernardino; (2) the Clean Desert Water Initiative; (3) the proposed business license tax on the permitted operators of solid waste disposal sites located in San Bernardino; (4) the Sunshine Canyon Landfill; (5) Norcal and the landfill.

We see no abuse of discretion in the trial court's denial of Cadiz's motion to compel since such discovery did not specifically seek evidence which might constitute an exception to the general rule precluding evidence outside the administrative record. Cadiz failed to establish that the requested documents could not have been obtained during the administrative proceedings in the exercise of reasonable diligence or that unusual circumstances justified production of the documents.

D. *Motion to Take Lauricella's Deposition*

The trial court also did not abuse its discretion in quashing Cadiz's notice of Lauricella's deposition. Cadiz sought to depose Lauricella[30] regarding his illicit activities leading to County approval of the landfill. Cadiz's attorney, John M. Bowman, met with Lauricella in state prison for two hours on October 28, 1996. In Bowman's declaration supporting Cadiz's motion to depose Lauricella, Bowman states that Lauricella was paid by Rail to organize a "front group" in the local community to support the landfill. Bowman's declaration further states that his discussion with Lauricella "covered a wide-range of topics, including Mr. Lauricella's participation in the concerted efforts of WMX/Rail Cycle to: (1) make illegal financial contributions to governmental officials to win approval of its Bolo Station landfill proposal; (2) destroy Cadiz' business operations; (3) organize and finance local political 'front' groups to support the landfill and oppose Cadiz' operations; (4) disseminate false information about Cadiz; (5) file false claims about Cadiz with governmental agencies; (6) illegally obtain information regarding Cadiz; and (7) disseminate false information about the backgrounds of Cadiz executives."

In Cadiz's reply to Rail's opposition, Cadiz stated that, according to Lauricella, at least one County official who voted for approval of the landfill was on the payroll of WMX, Inc., Rail's parent company. Cadiz further stated in its reply that Lauricella was involved in several felonious criminal acts which could not be disclosed in the reply because of an ongoing criminal investigation but would be disclosed to the court in camera if necessary. Bowman's supporting declaration stated that Lauricella and Rail executives engaged in "Placing at least one San Bernardino County official who voted to approve the landfill onto the payroll of WMX, Inc., Rail Cycle's parent company." Bowman also stated in his declaration that Lauricella told him "that he attended secret meetings in which at least one County official was present when Rail Cycle executives openly discussed Mr. Lauricella's illicit activities."

Although Lauricella's deposition testimony would normally constitute inadmissible extra-record evidence, Cadiz argues that it fell within an exception to the general rule because Lauricella's testimony would show agency misconduct. But Cadiz did not meet its burden of establishing this.

---

[30]Cadiz was required to bring a motion to depose Lauricella because Lauricella was in state prison. (Code Civ. Proc., §§ 1995 & 1996.) Code of Civil Procedure section 1996 provides that a court may order the deposition of a prisoner upon a motion supported by an "affidavit showing . . . the testimony expected from the witness, and its materiality." (Code Civ. Proc., § 1996.)

Although Bowman's supporting declarations could be read as inferring that Lauricella might testify to acts of bribery of Board and CPC members in connection with the administrative proceedings, Bowman's declarations are ambiguous and evasive in this regard such that it was not an abuse of discretion for the trial court to conclude that there was inadequate evidence that Lauricella's deposition would lead to evidence of fraud or corruption. We conclude the trial court did not abuse its discretion in denying Cadiz's motion to depose Lauricella.

### E. *Motion to Quash Deposition Notices and for a Protective Order*

Cadiz served deposition notices on Gary Rasmussen (a Rail geology consultant), Hank Jong and Sandra Alarcon-Lopez (Jacobs Engineering Group Inc., engineers), Edwin Barnes III, Ph.D. (a university professor and project consultant), John Marti, Jr., and Paul Limon (community activists who spoke in favor of the landfill during the EIR process), and Michael Dombrowski (chairman of the CPC). The notices did not indicate the subject matter to be encompassed in the depositions. Several of the deposition notices contained numerous production requests, including requests similar to those which were the subject of Cadiz's motion to compel further production requests.

Rail moved to quash these depositions, and Cadiz opposed the motion on the ground Cadiz intended to take the depositions for the following purposes: to determine why the County did not perform additional trenching on lineament A; to inquire regarding settlement calculations; to determine why Jacobs Engineering Group Inc. made reference to the R&W seismic report but did not include it in the administrative record; to inquire regarding errors in Rasmussen's reports and the nondisclosure of aerial photographs; to reveal Rail's use of paid operatives to organize and finance front groups to support the landfill; to expose Lauricella's illicit activities and Dombrowski's attendance at secret meetings with Lauricella and Rail executives; and to inquire regarding Barnes's employer's negotiations with Rail to enter a partnership to develop waste management systems and technologies. Other than perhaps agency misconduct, there does not appear to be justification for the requested depositions.

The only purported evidence supporting Cadiz's allegations of agency misconduct consists of the declaration of Cadiz's attorney, John Bowman, which is not based on personal knowledge of Dombrowski's or Lauricella's alleged illicit acts, and the declaration of a Cadiz resource analyst who claimed to have seen and heard Limon, Marti and Lauricella bad-mouthing Cadiz at a Bristol Valley Environmental Coalition booth. We thus conclude

the trial court could reasonably find that Cadiz failed to establish that the requested depositions were reasonably calculated to lead to admissible evidence of agency misconduct. Rather, the depositions appear to have been noticed for the purpose of obtaining evidence (1) to show that an administrative agency had not considered "all relevant factors" in making its decision and (2) to show the evidence the agency had considered did not support its decision. Under *Western States,* such evidence is inadmissible, and thus the trial court did not abuse its discretion in granting the County and Rail's motion to quash and for a protective order.

### VI. *Cadiz's Challenges to the Trial Court's Summary Judgment, New Trial, and Cost Award Rulings Are Moot, as Is the County's Consolidated Appeal*

Cadiz challenges the trial court's rulings granting the County and Rail's summary judgment motion, denying Cadiz's motion for new trial, and awarding Rail its costs for the preparation of the administrative record. Because we conclude the judgment must be reversed due to an inadequate EIR, these contentions are moot. The County's consolidated appeal of the trial court ruling denying the County's motion for attorneys' fees is also moot.

### VII. *Disposition*

The EIR is inadequate because it fails to discuss the estimated volume of groundwater contained in the aquifer underlying Rail's proposed landfill site. The trial court ruling on Cadiz's writ of mandate claims is reversed, with instructions to issue a writ of mandate setting aside the County's decision to certify the EIR/EIS and related trial court decisions that are contingent upon the certification of the EIR, including summary judgment on the sixth and seventh causes of action.

The parties are to bear their own costs on appeal.

McKinster, Acting P. J., and Ward, J., concurred.

APPENDIX A

## Location of Proposed Rail•Cycle Dump

010761

APPENDIX B

FIGURE 4.2-2 GROUND WATER BASINS IN THE
PROJECT AREA

SOURCE: CALIFORNIA DEPARTMENT OF WATER RESOURCES
LOS ANGELES OFFICE RECORDS. 1990

4-7

021090